Reversed and remanded by published opinion. Judge WYNN wrote the majority opinion, in which Judge GREGORY concurred. Chief Judge TRAXLER wrote a dissenting opinion.
OPINION
WYNN, Circuit Judge:
On appeal, Sean C. Sowards argues that the district court erred in denying his mo *585 tion to suppress because the police lacked probable cause to initiate a traffic stop based exclusively on an officer’s visual estimate — uncorroborated by radar or pacing and unsupported by any other indicia of reliability — that Sowards’s vehicle was traveling 75 miles per hour (“mph”) in a 70-mph zone. We agree and therefore reverse the district court.
I.
Deputy James Elliott stopped Sowards for speeding along North Carolina’s Interstate 77 after visually estimating that So-wards’s vehicle was traveling 75 mph in a 70-mph zone. Although Deputy Elliott’s patrol car was equipped with radar, he had intentionally positioned his patrol car at an angle that rendered an accurate radar reading impossible. During the traffic stop, Deputy Elliott had a canine trained in drug detection, Ringo, sniff the outside of Sowards’s vehicle. When Ringo signaled the possible presence of a controlled substance, Deputy Elliott, along with other officers, searched Sowards’s vehicle and discovered approximately 10 kilograms of cocaine. Subsequently, a grand jury charged Sowards with possession of at least 5 kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A).
Before trial, Sowards moved to suppress the evidence on the basis that Deputy Elliott lacked probable cause to initiate the traffic stop in violation of the Fourth Amendment.[1] At the suppression hearing, Deputy Elliott testified that he was certified in the use of radar equipment in North Carolina. As a condition of obtaining radar certification, Deputy Elliott was required to visually estimate the speed of twelve separate vehicles and then have his visual speed estimates verified with radar. To pass the road test, Deputy Elliott’s visual speed estimates could not vary from the radar by greater than a total of 42-mph for all twelve vehicles combined. Deputy Elliott testified, however, that, for any one vehicle, his visual speed estimate could have been off by as much as 12 mph, so long as he did not exceed the 42 mph total for all twelve vehicles combined.
Over the objection of defense counsel, Deputy Elliott testified that he had visually estimated that Sowards’s vehicle was traveling 75 mph. Deputy Elliott further testified that the posted speed limit was 70 mph and that, therefore, Sowards’s vehicle was exceeding the legal speed limit by 5 mph. Deputy Elliott also stated that he did not attempt to verify, or otherwise corroborate, his visual speed estimate with his radar unit; he did not attempt to pace Sowards’s vehicle with his patrol car to gauge the speed; and he had not been trained on, and therefore did not use, the VASCAR system, which utilizes a stopwatch to approximate the time it takes a vehicle to travel over a predetermined distance.
When asked what technique, if any, he used to estimate the speed of Sowards’s vehicle, Deputy Elliott testified as follows:
Q. [Government counsel] And do you learn certain techniques in visually determining the speed of the vehicle?
A. [Deputy Elliott] There’s not really a technique. I’ve been measuring speeds all my life.
*586 Q. And the radar serves what function in relation to your visual observation of the speed of the vehicle?
A. It’s just a second opinion that already corroborates what you already know.
J.A. 24.
Q. [Defense counsel] You testified earlier that there was no technique to estimating speed. You use no technique; is that correct?
A. [Deputy Elliott] You don’t need a technique. It’s all based on your training and experience. As long as you have a tracking history and you have experience in observing speeds.
Q. So you can just basically look at a vehicle and guess.
A. There’s no guessing about it. It’s an estimation based on tracking history and my training and experience.
Q. Based on tracking history.
A. That’s correct.
Q. Which would be?
A. Being able to sufficiently see that vehicle, that vehicle coming towards me, that vehicle passing me, me being able to estimate that vehicle’s speed.
Q. And generally how long [did] you watch [Sowards’s] vehicle?
A. At this point in time [Sowards] was approximately a hundred yards out before he was in front of me.
Q. Football field.
A. Approximately.
Q. Approximately. So you can estimate distance.
J.A. 80-81.
Subsequently, however, Deputy Elliott testified that he did not measure the distance that he tracked Sowards’s vehicle and that his testimony of 100 yards of tracking history was an approximation rather than a certainty. Furthermore, on cross-examination, and when questioned directly by the district court about his knowledge of distances, Deputy Elliott gave several inconsistent and incorrect answers regarding measurements:
Q. [Government counsel] And how many feet are in a hundred yards?
A. [Deputy Elliott] There’s 12 feet in a yard.
Q. So 300 feet?
A. Correct.
J.A. 109.
THE COURT: And how many feet are in a yard?
[Deputy Elliott]: How many feet? There’s 12 feet in a yard.
THE COURT: Well, do you know what a yardstick is?
[Deputy Elliott]: Yes, sir.
THE COURT: How many inches in a yardstick?
[Deputy Elliott]: Well, on a yardstick there’s 12 inches. Well, it depends on the yard stick that ... you have.
THE COURT: Use your hands to indicate a yardstick.
[Deputy Elliott]: A yardstick is about that long (indicating).
THE COURT: All right. And how many inches are in it?
THE WITNESS: Four foot in a yard.
J.A. 116.
Thereafter, Deputy Elliott testified that his visual estimation of the speed of So-wards’s vehicle was not dependent on his ability to estimate the distance that it traveled.
Q. [Defense counsel] So how can you estimate speed without knowing the distance?
A. [Deputy Elliott] Because of my visual observation. I know that it takes a quicker time for vehicles to come at me *587 at 75 miles per hour versus the 70 miles per hour zone in that area. The reason why I know that is because I’ve been working that area for approximately four and a half years. I’ve conducted radar enforcement. I’ve also conducted speed estimations upon my estimation of vehicles that I see that I work that area on a daily basis.
J.A. 80.
Q. Well, how can you be certain that [Sowards’s vehicle] was going 75 miles an hour?
A. My training and experience.
Q. Could you explain.the specifics of your visual estimation training as far as how you arrive at a speed.
A. Because I know a vehicle traveling 75 miles per hour, it gets faster to me than a vehicle that’s traveling 70 miles per hour by my visual observation.
J.A. 93-94.
The district court denied Sowards’s motion to suppress, rejecting Sowards’s arguments and finding that Deputy Elliott had probable cause to initiate the traffic stop of Sowards’s vehicle:
Officer Elliott had probable cause to believe a traffic violation had occurred based on speed. He’s 'trained to estimate speeds. His difficulty with measurements is immaterial to his estimate of speed as that did not depend on time or distance. And the certification that he received, I believe three times, depended on accuracy in estimating speeds. So he had a particularized and objective basis for suspecting that a traffic violation had occurred.
J.A. 121. Subsequently, Sowards entered a conditional guilty plea, reserving the right to appeal any issues related to his suppression motion. At the sentencing hearing, the district court sentenced So-wards to 70 months’ imprisonment, which was the low end of the Sentencing Guidelines range.[2] Sowards filed a timely notice of appeal.
II.
A.
The issue on appeal is whether Deputy Elliott’s traffic stop of Sowards’s vehicle was supported by probable cause and, accordingly, whether the district court properly denied Sowards’s motion to suppress the evidence seized from the car as a result of the traffic stop.
We review the district court’s legal determinations de novo and its factual determinations for clear error. United States v. Moreland, 437 F.3d 424, 429 (4th Cir. 2006). Under the clear error standard, “[a] factual finding by the district court may be reversed only if, ‘although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.’” Walton v. Johnson, 440 F.3d 160, 173-74 (4th Cir.2006) (en banc) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). The evidence is construed in the light most favorable to the Government, the prevailing party below. United States v. Seidman, 156 F.3d 542, 547 (4th Cir.1998).
The Fourth Amendment guarantees “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. Const, amend. IV. “When a police officer stops an automobile and detains the occupants briefly, the stop *588 amounts to a seizure within the meaning of the Fourth Amendment.” United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011) (citing Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). “[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable.” Wilson v. Arkansas, 514 U.S. 927, 931, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995); see also Whren, 517 U.S. at 810, 116 S.Ct. 1769 (“An automobile stop is thus subject to the constitutional imperative that it not be ‘unreasonable’ under the circumstances.”). “As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.” Id. Probable cause exists if, given the totality of the circumstances, the officer “had reasonably trustworthy information ... sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense.” Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); see also Porterfield v. Lott, 156 F.3d 563, 569 (4th Cir.1998).
Accordingly, our inquiry here is whether, given the totality of the circumstances, Deputy Elliott had reasonably trustworthy information sufficient to support a prudent person’s belief that Sowards was speeding.[3]
B.
The district court, found that “Officer Elliott had probable cause to believe a traffic violation had occurred” because Officer Elliott was “trained to estimate speeds” and because “the certification that he received ... depended on accuracy in estimating speeds.” J.A. 121. The district court also found that Officer Elliott’s “difficulty with measurements is immaterial to his estimate of speed as that did not depend on time or distance.” Id. Based on these findings, the district court concluded that Officer Elliott “had a particularized and objective basis for suspecting that a traffic violation had occurred.” Id.
We hold, based on the record before us, that several of the district court’s material factual findings were clearly erroneous.
First, it was clear error for the district court to find that Deputy Elliott was “trained to estimate speeds.” J.A. 121. Contrary to this finding, the record indicates that Deputy Elliott was trained to use a radar unit. Rather than being “trained to estimate speeds,” Deputy Elliott was given, the opportunity to “guess ” the speed of twelve vehicles and, in doing so, he demonstrated the proficiency of *589 guessing within a total margin of error of 42 mph for all twelve of those vehicles. There was no testimony or evidence that Deputy Elliott received any specialized training in the estimation of vehicle speeds. In fact, Deputy Elliott’s testimony confirmed that he used absolutely no technique or method to visually guess vehicle speeds. Given this testimony, and the absence of contrary evidence in the record, it was clearly erroneous for the district court to find that Deputy Elliott was trained to estimate speeds.[4] Cf. State v. Estes, 148 Idaho 345, 223 P.3d 287, 290-91 (App.2009) (holding that certified officer’s visual speed estimate was insufficient to convict defendant of speeding, where officer’s testimony failed to reveal precise accuracy rates and margin of error for his visual speed estimates during certification).[5]
Second, it was clear error for the district court to find that Deputy Elliott’s “difficulty with measurements is immaterial to his estimate of speed as that did not depend on time or distance.” J.A. 121. This finding rings in the absurd because one cannot discern a speed of a vehicle measured in miles-per-hour without discerning both the increment of distance traveled and the increment of time passed. Indeed, the very definition of speed derives from the mathematical formula of distance divided by time. See, e.g., War-boys v. Proulx, 303 F.Supp.2d 111, 116 n. 6 (D.Conn.2004) (“To calculate average speed, one divides the distance traveled by the time it took to travel this distance, [distance -e time = speed ... ]”). This Court may properly take judicial notice of this formula. See, e.g., Ballantine v. Cent. R.R. of New Jersey, 460 F.2d 540, 543 (3rd Cir.1972).[6]
*590 Furthermore, the materiality of Deputy Elliott’s “difficulty with measurements” was established by Deputy Elliott’s own testimony. During the suppression hearing, Deputy Elliott exhibited a notable absence of fluency in his knowledge of distance measurements. Deputy Elliott testified that: (1) “There’s 12 feet in a yard,” J.A. 109, 116; (2) “300 yards would be a [100] yards,” J.A. 109; and (3) “on a yardstick there’s 12 inches.” J.A. 116. Deputy Elliott also testified that the number of inches on a yard stick “depends on the yard stick,” J.A. 116, and that math could change “depend[ing] on the person who’s behind it.” J.A. 88. In light of this testimony, it is material — and indeed troubling — that Deputy Elliott asserted that his visual estimates of speed are dependent on his observation of the “tracking history” of a vehicle. See, e.g., J.A. 81 (testifying that: (1) a technique is not required to estimate speeds “[a]s long as you have a tracking history....”; and (2) his method of estimating speed is not a guess because “[i]t’s an estimation based on tracking history....”). Given that Deputy Elliott further testified that he had “a hundred yards” of tracking history on Sowards’s vehicle to estimate its speed, J.A. 81, it was clearly erroneous for the district court to find that Deputy Elliott’s difficulty with measurements was immaterial to his estimate of the speed of Sowards’s vehicle.[7]
C.
Notwithstanding these two clearly erroneous factual findings by the district court, the Government contends that Deputy Elliott’s visual speed estimate, standing alone, provided probable cause for Deputy Elliott to initiate a traffic stop of Sowards’s vehicle for speeding.[8]
*591 However, the Fourth Amendment does not allow, and the case law does not support, blanket approval for the proposition that an officer’s visual speed estimate, in and of itself, will always suffice as a basis for probable cause to initiate a traffic stop. Instead, for the purposes of the Fourth Amendment, the question remains one of reasonableness. Critically, and as further explained below, the reasonableness of an officer’s visual speed estimate depends, in the first instance, on whether a vehicle’s speed is estimated to be in significant excess or slight excess of the legal speed limit. If slight, then additional indicia of reliability are necessary to support the reasonableness of the officer’s visual estimate.[9]
1.
In United States v. Ludwig, our sister Circuit framed this analysis similarly in holding that “an officer’s visual estimation can supply probable cause to support a traffic stop for speeding in appropriate circumstances.” 641 F.3d 1243, 1247 (10th Cir.) (emphasis added), cert. denied, — U.S. -, 132 S.Ct. 306, 181 L.Ed.2d 187 (2011). Although Ludwig did not elaborate on the circumstances that may make a visual speed estimate appropriate to supply probable cause, we find that at a minimum there must be sufficient indicia of reliability for a court to credit as reasonable an officer’s visual estimate of speed.
Thus, where an officer estimates that a vehicle is traveling in significant excess of the legal speed limit, the speed differential — i.e., the percentage difference between the estimated speed and the legal speed limit — may itself provide sufficient “indicia of reliability” to' support an officer’s probable cause determination. See, e.g., United States v. Banks, No. 2:08-cr-19-FtM-29SPC, 2008 WL 4194847, at *1, *4 (M.D.Fla. Sep. 11, 2008) (finding probable cause where officer observed vehicle “traveling at a high rate of speed,” estimated to be 50-60 mph in a 30-mph zone, making it “extremely obvious to [the offi *592 cer] that the vehicle was speeding”); State v. Butts, 46 Kan.App.2d 1074, 269 P.3d 862, 873 (2012) (finding reasonable suspicion where officer “estimated vehicle speed [was 45 mph in a 30-mph zone, which was] significantly higher than the posted speed limit and, as a result, a difference that would be discernable to an observant and trained law enforcement officer”); cf. People v. Olsen, 22 N.Y.2d 230, 292 N.Y.S.2d 420, 239 N.E.2d 354, 355 (1968) (holding officer’s visual speed estimate of vehicle traveling 50-55 mph in a 30-mph zone sufficient to support speeding conviction).
However, where an officer estimates that a vehicle is traveling in only slight excess of the legal speed limit, and particularly where the alleged violation is at a speed differential difficult for the naked eye to discern, an officer’s visual speed estimate requires additional indicia of reliability to support probable cause. See United States v. Moore, No. 10 Cr. 971(RJH), slip op., 2011 WL 6325973 at *6 (S.D.N.Y. Dec. 19, 2011) (finding that stop was unsupported by probable cause and explaining that, absent an officer’s estimate that a vehicle is traveling “significantly in excess” of the legal speed limit, “courts will credit an officer’s testimony regarding firsthand observation of a speeding vehicle if additional, specific details of his or her account confirm that the officer’s observation and belief were reasonable”); cf. City of Kansas City v. Oxley, 579 S.W.2d 113, 116 (Mo.1979) (holding that officer’s uncorroborated opinion evidence of defendant’s 45-mph speed in a 35-mph zone was insufficient evidence to allow trier of fact to find that defendant was speeding); Olsen, 292 N.Y.S.2d 420, 239 N.E.2d at 355 (“[A]bsent mechanical corroboration, [testimony] that a vehicle was proceeding at 35 or 40 miles per hour in [a 30-mph] zone might for obvious reason be insufficient [to sustain a conviction for speeding], since it must be assumed that only a mechanical device could detect such a slight variance with [sufficient] accuracy.”); State v. Kimes, 234 S.W.3d 584, 589 (Mo.Ct.App.2007) (“[W]here an officer’s estimation of speed is 60 m.p.h., a fact-finder cannot conclude with any degree of certainty that a defendant was exceeding a 55 m.p.h. speed limit because the accuracy of human estimation of speed cannot easily, readily, and accurately discriminate between such small variations in speed.”); Peoples Drug Stores v. Windham, 178 Md. 172, 12 A.2d 532, 537 (1940) (“[A]n estimate is necessarily approximate and not exact for without mechanical aides it is manifestly impossible for any one ... to estimate precisely the speed of a moving object, and that fact is assumed by every one possessing ordinary common sense.”).
The reasonableness of an officer’s visual estimate that a vehicle is traveling in slight excess of the legal speed limit may be supported by radar, pacing methods, or other indicia of reliability that establish, in the totality of the circumstances, the reasonableness of the officer’s visual speed estimate. See e.g., United States v. Gomez Valdez, No. 4:10CR3100, 2011 WL 5037190, at *4 (D.Neb. Sept. 12, 2011) (finding probable cause where officer’s visual estimate was verified by radar confirming that defendant was traveling 70-mph in a 65-mph zone); United States v. Nunez, No. L10-CR-127, 2011 WL 2357832, at *1 (D.Utah June 9, 2011) (finding reasonable suspicion where officer’s visual estimate was supported by pacing, which confirmed that defendant was traveling 85 mph in a 75-mph zone); United States v. Colden, No. 11-M-989-SKG, 2011 WL 5039777, at *1, *2 (D.Md. Oct. 21, 2011) (holding that officer’s “visual estimation of defendant’s speed, in combination with the officer’s observations that his car shook [when defendant’s car passed] and *593 that defendant tapped his brakes, amounts to a reasonable articulable suspicion that defendant was speeding”); United States v. Fuentes, No. 09 Cr. 860, 2010 WL 707424, at *3 (S.D.Tex. Feb. 23, 2010) (finding reasonable suspicion where officer’s visual speed was supported by additional observations — i.e., vehicle’s relative speed and roaring engine — and such observations were corroborated by patrol car’s video camera); United States v. Riley, No. 07 Cr. 226, 2007 WL 3204063, at *4 (D.Neb. Oct. 30, 2007) (finding reasonable suspicion where officer’s visual speed estimate was supported by separate radio dispatch indicating defendant’s vehicle was driving recklessly).
Such additional indicia of reliability need not require great exactions of time and mathematical skill that an officer may not have, but they do require some factual circumstance that supports a reasonable belief that a traffic violation has occurred. In the absence of sufficient additional indicia of reliability, an officer’s visual approximation that a vehicle is traveling in slight excess of the legal speed limit is a guess that is merely conclusory and which lacks the necessary factual foundation to provide an officer with reasonably trustworthy information to initiate a traffic stop.[10] See Moore, 2011 WL 6325973, at *8; State v. Petzoldt, No. 10-0861, 2011 WL 2556961, at *3-4 (Iowa Ct.App. June 29, 2011) (holding that “[without the facts upon which [the police officer] formed his belief that [defendant’s] truck was speeding, we cannot determine whether his belief was reasonable”, notwithstanding officer’s testimony that “he believed [defendant] was traveling at a speed greater than the posted speed limit” and officer’s 31 years of experience).
2.
Here, Deputy Elliott opined, based on his visual observation alone, that Sowards’s vehicle was traveling 75 mph in a 70-mph zone. Deputy Elliott did not corroborate his opinion with radar, pacing, or otherwise. Furthermore, Deputy Elliott’s opinion was not supported by sufficient additional indicia of reliability. Therefore, standing alone, Deputy Elliott’s visual speed estimate — made at a speed differential of only 5 mph at a high rate of speed[11] — did not provide Deputy Elliott *594 with “reasonably trustworthy information ... sufficient to warrant a prudent [person] in believing that [Sowards] had committed” a speeding violation. Beck, 379 U.S. at 91, 85 S.Ct. 223.
We agree that “the accuracy of human estimation of speed cannot easily, readily, and accurately discriminate between such small variations in speed.”[12] Kimes, 234 S.W.3d at 589; see also Olsen, 292 N.Y.S.2d 420, 239 N.E.2d at 355. Unlike Ludwig, where the court noted that there was “no affirmative reason to think that the trooperfs] ... estimate should be discredited,” 641 F.3d at 1247, here the record reflects myriad reasons to discredit, and no reason to credit, Deputy Elliott’s estimate.
Therefore, we conclude that Deputy Elliott’s visual speed estimate was in fact a guess that was merely conclusory, without an appropriate factual foundation, and simply lacking in the necessary indicia of reliability to be an objectively reasonable basis for probable cause to initiate a traffic stop.
III.
We address separately our dissenting colleague’s primary contention that the record supports a finding of Deputy Elliott’s expertise in the visual estimation of vehicle speeds within an average 3.5-mph margin of error. Post at 597-98, 599, 601-02, 604-05, 609-10, 612-13. On the basis of this contention, the dissent “believe[s] the government has easily established that Deputy Elliott ... had probable cause to stop Sowards’s vehicle” for traveling 75 mph in a 70-mph zone. Post at 602-03. Thus, in the view of the dissent, Sowards’s constitutional right to be free from unreasonable seizures is overcome by Deputy Elliott’s purported “expertise,” which in turn depends on the “road test” Deputy Elliott satisfied as part of his radar certification.
We accord Deputy Elliott no such expertise, as there is no indication in the record that this road test was designed or intended as an evaluation of Deputy Elliott’s ability to estimate vehicle speeds in any context other than in conjunction with radar. Indeed, one thing we know about the *595 road test is that Deputy Elliott was -required to estimate the speeds of “12 separate vehicles ... and then corroborate [his] visual calculations with the use of a radarf]” J.A. 24-25 (emphasis added) (A: “[T]hat’s when the certified [radar] instructor takes off the piece of paper off your radar unit and advises you what the actual clock was.”). Thus, to the extent that the road test prepared Deputy Elliott to visually estimate vehicle speeds, it did so only to the extent subsequently corroborated by radar, which, in this case, Deputy Elliott failed to do.
The record also reflects that Deputy Elliott may have passed the road test but nonetheless “be[en] off up to 12 miles an hour on [any] one vehicle” and “42 miles per hour” on all twelve vehicles. J.A. 26. Consequently, it is entirely possible that Deputy Elliott’s visual estimates were off by six mph on seven vehicles and perfect on the other five vehicles. In such case, although Deputy Elliott’s “average” or “mean” margin of error would have been only 3.5-mph per vehicle, his “median” and “mode” margin of error would have been six mph per vehicle. Given that we are faced here with a mere five mph differential, those hypothetical results — as equally possible as those presented by the dissent — would seem to call into question the dissent’s probable cause analysis concerning the inherent reliability of Deputy Elliott’s unaided visual estimate of speed.
The record further shows that Deputy Elliott made his visual speed estimates, not “in a test environment ... where the situation is controlled,” but instead “on the street with actual drivers.” J.A. 25. Presumably — although, again, this is unknown — the vehicle speeds of these “actual drivers” were impacted by the speed limit in the area tested, as well as the presence of police officers conducting a radar test. In any case, to the extent one would allow Deputy -Elliott to use the results of this road test to overcome Sowards’s constitutional right to be free from unreasonable seizures, prudency dictates the consideration of these and other questions relevant to the road test’s design and reliability. Cf. People v. Palermo, 33 Misc.3d 1205, 2009 WL 8474301 (N.Y.City Ct. Sept. 28, 2009) (notwithstanding officer’s testimony “that .-he. passed an examination,” finding that traffic stop lacked probable cause because officer failed to testify about type of training, length of training, or content of training); Estes, 223 P.3d at 290-91 (same).
The dissent overlooks these' and other shortcomings, and would instead find probable cause on the basis of Deputy Elliott’s “demonstrated an[d] uncontradicted ability to visually estimate the speed of vehicles within an average margin of error of 3.5 mph per vehicle.” Post at 602. Indeed, under this line of reasoning, our colleague in dissent would apparently permit traffic stops on the basis of an officer’s uncorroborated and unsupported visual estimate that a vehicle is traveling 71 mph in a 70-mph zone.[13] See post at 605 (citing with approval State v. Singh, No. F-98-022, 1999 WL 355270, at *1 (Ohio Ct.App.1999), where court noted officer’s testimony that his visual estimates were accurate within 1-2 mph).[14] Following the dissent’s ap *596 proach to its logical conclusion, we see no limits upon an officer’s, such as Deputy Elliott’s, powers of speed estimation. Nevertheless, it defies all reason to believe that Deputy Elliott, particularly in light of his difficulty with distances, would be able to accurately estimate with his vision alone, within the same 3.5-mph margin of error, the speed of a car traveling ten mph, 25 mph, 50 mph, 75 mph, 100 mph, 150 mph, or, presumably, a plane traveling 700 mph.
A short example from our national pastime seems particularly apt here. One year ago, the fastest pitch in the annals of baseball history was recorded: 106 mph, by Cincinnati Reds left-handed pitcher Aroldis Chapman. See Jeff Passan, Chapman’s 106-mph fastball was likely bogus, Yahoo Sports, April 19, 2011, HTTP:// sports.yahoo.com/mlb/news?slug=jppassan_aroldis_chapman_106_radar_reds_ fastball_controversy_041911 (last visited April 26, 2012). While the pitch itself is remarkable in its own right, a sports reporter noted a perhaps even more interesting phenomenon associated with the actual measurement of that pitch as “three nuggets of information started to parade themselves as facts.” Id. Specifically, the radar connected to the scoreboard showed the speed as 106 mph, the television broadcast’s radar reflected that it was 105 mph, while the radar system used by Major League Baseball, which utilizes three cameras on a single pitch that calculate each pitch’s speed more than 50 times, pegged the pitch at only 102.4 mph. Id. In light of three seemingly unimpeachable, entirely reliable sources, the writer was left with the inevitable question, “How can one pitch travel three different velocities?” Id. The writer went on to surmise that “[u]n-less one of Chapman’s fastballs voyaged through the Matrix, another in the Source Code and the third in reality, it leaves us with a question more appropriate for a philosophy class than a baseball discussion.” Id.
Indeed, in the world of baseball, there are even more absolutes than the facts presented in this case. For example, the distance between the pitcher’s mound and home plate is fixed at 60 feet 6 inches; likewise, the clip of Chapman’s fastball has now been viewed more than 500,000 times online. See, e.g., http://www.youtube.com/ watch?v=HbBhONsNisQ (last visited April 26, 2012). Even so, and presumably despite efforts by so-called experts like Deputy Elliott in visual speed estimation, the controversy remains.
, Here, the dissent’s contention that Deputy Elliott’s estimate may be unreliable, uncorroborated and unsupported and yet still comport with the “reasonableness” threshold of the Fourth Amendment, is not — and cannot be — the law. We hold that the objective unreliability of Deputy Elliott’s uncorroborated and unsupported visual estimate is categorically irreconcilable with Beck’s requirement for “reasonably trustworthy information” to serve as the foundation for probable cause. 379 U.S. at 91, 85 S.Ct. 223. Deputy Elliott’s visual estimate that Sowards’s vehicle was traveling 75 mph was the sole basis of his probable cause to initiate the traffic stop and subsequent seizure of Sowards’s vehicle. As such," the seizure .was constitutionally unreasonable, and the evidence gathered pursuant to the search must be suppressed.
, Notwithstanding the dissent’s protestations, the sky will not fall as a result of today’s majority decision.[15] According to *597 the dissent it is “[i]ronic [that] while a layperson can estimate the speed of [] a vehicle based upon his or her personal observations, an experienced and trained police officer no longer can.” Post at 598. But the irony, if any, of the dissent’s comparison is lost when one recognizes that lay persons do not use their estimates to stop vehicles on public highways. Because police officers do stop vehicles, their estimates must satisfy the Fourth Amendment’s probable cause requirement.
Next, the dissent contends that “the majority completely invalidates the road test North Carolina has employed for its traffic officers to demonstrate their ability to estimate the speed of cars.” Post at 612. Setting aside that it is wholly unclear why such a policy consideration would have any relevance to a Fourth Amendment probable cause analysis, today’s majority opinion makes no such holding that invalidates North Carolina’s radar certification test for its intended purpose: namely to instruct officers on the use of radar instruments.
The dissent further contends that today’s majority opinion creates a “heightened evidentiary burden” for traffic stops based solely on an officer’s estimate of a vehicle’s slight speeding. Post at 598-99. However, Beck’s requirement that “reasonably trustworthy information” must serve as the foundation for probable cause dates to 1964, and, indeed, the Fourth Amendment specifically protects persons against unreasonable searches and seizures; we see nothing “heightened” in requiring a police officer to have probable cause based on “reasonably trustworthy information” prior to stopping a motor vehicle for speeding. 379 U.S. at 91, 85 S.Ct. 223.
IV.
For the foregoing reasons, we hold that the district court erred in denying So-wards’s motion to suppress because Deputy Elliott lacked probable cause to initiate a traffic stop based exclusively on his uncorroborated and unsupported belief that Sowards was traveling 75 mph in a 70-mph zone.

REVERSED AND REMANDED

. Sowards also challenged, among other things, the open-air dog sniff on the basis that the officers lacked the necessary reasonable suspicion that illegal activity was afoot to continue his detention beyond the time required to issue a traffic citation. Because our disposition rests on Deputy Elliott's lack of probable cause to initiate the traffic stop in the first place, we need not reach these issues and have, accordingly, omitted the related facts.

. Our review of the district court’s docket reveals that Sowards served his entire prison sentence and began a three year period of supervised release on May 20, 2011.

. To appreciate the difference in view expressed by our colleague in dissent, it is worthy to note that the dissenting opinion urges this Court to undertake a probable cause inquiry by reference to what probable cause is not. See post at 601 ("The probable-cause standard does not even require that the officer's belief be more likely true than false.” (quotation marks omitted)). We, however, decline to adopt this analytical approach; probable cause is the threshold that protects citizens from unreasonable searches and seizures that violate the Fourth Amendment to the Constitution and, therefore, our focus is on what probable cause does require. For probable cause to mean anything, it has to mean something. See Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) ("The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.... To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.”); Wong Sun v. United States, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ("The history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would leave law-abiding citizens at the mercy of the officers' whim or caprice.” (quotation marks omitted)).

. Our colleague in dissent disputes this conclusion by noting Deputy Elliott’s "uncontradicted testimony” that "a certified instructor ... 'showed him how to estimate the speeds' of vehicles.” Post at 611 ("That sounds like training to me.”). The record does not support the dissent’s view. First, the "certified instructor” Deputy Elliott identified was a "certified radar operator ” who "show[ed Deputy Elliott] how to work the radar." J.A. 23 (emphasis added). There is no evidence that this instructor was certified or otherwise qualified to "train” Deputy Elliott in how to visually estimate the speeds of vehicles. Second, immediately after giving this “uncontradicted testimony,” post at 585, Deputy Elliott directly contradicted it. See J.A. 24 ("Q: And do you learn certain techniques in visually determining the speed of the vehicle?” A: "There’s not really a technique.”).

. The district court’s decision to qualify Deputy Elliott as an expert in the unaided visual estimation of vehicle speed was clearly inconsistent with the requirement of Rule 702 of the Federal Rules of Evidence "that [expert] testimony ... be the product of reliable principles and methods.” United States v. Baptiste, 596 F.3d 214, 222 (4th Cir.2010); see also United States v. Johnson, 617 F.3d 286, 294 (4th Cir.2010) (stating that experts "must use reliable principles and methods, and apply those principles and methods reliably to the facts of the case.”). Although the court's role as "gatekeeper,” in ensuring that expert testimony is “reliable and relevant,” Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), is constant throughout all judicial proceedings, we recognize that the "Federal Rules of Evidence[, apart from testimonial privileges,] do not apply at suppression hearings.” United States v. Schaefer, 87 F.3d 562, 570 (1st Cir. 1996); Fed.R.Evid. 104(a). As such, we need not and do not address the district court's inexplicable determination to qualify Deputy Elliott as an expert.

.Our dissenting colleague contends that "there is no evidence [in the record] that the reliability of an officer’s visual estimation of speed is or should be tied to a specific or minimum distance or time.” Post at 611. If the dissent believes estimation of speed is not tied to distance or time, what then would be the dissent's mathematical formula for speed? Without a consideration of a specific distance and time, we are left with Deputy Elliott’s purely speculative guess of the speed of So-wards's vehicle. That’s not enough to establish probable cause. See, e.g., Terry v. Ohio, *590 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (predicating reasonable suspicion — a less robust standard than probable cause — on the existence of "specific and articulable facts” and "rational inferences from those facts” because "[a]nything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.” (emphasis added)).

. The dissent points to the absence of "evidence [in the record] that North Carolina’s certification procedure for estimating speeds is dependent upon distance or time.” Post at 611. This assertion is misleading and misplaced; the former because, rather than a "certification” for "estimating speeds,” Deputy Elliott's certification was for the use of radar; the latter because, if not distance and time, then on what basis would a hypothetical certification in visual speed estimation in miles (distance) per hour (time) depend?

. The Government relies on an unpublished opinion of this Court — decided without oral argument and issued per curiam. See United States v. Daras, No. 98-4286, 1998 WL 726748, at *2 (4th Cir. Oct. 16, 1998) (per curiam) ("[T]he Government correctly points out that the officer’s visual estimate is also sufficient, by itself, to support a conviction.”). This case is not binding. The Government also relies on a non-binding and materially distinguishable decision issued by a district court in United States v. Womom, 754 F.Supp. 517, 519 (W.D.Va.1991) (where radar evidence was suppressed, affirming conviction of defendant for speeding based on officer’s visual speed estimate).
The standard for evidence to convict is more exacting than the standard sufficient to support probable cause. See Porterfield, 156 F.3d at 569. Flowever, a speeding violation presents a unique circumstance, see United States v. Moore, No. 10 Cr. 971(RJH), slip op., 2011 WL 6325973 at *5 (S.D.N.Y. Dec. 19, 2011), because reliable evidence of the vehicle's speed generally provides the objectively reasonable basis for probable cause to initiate the traffic stop. Although our discussion of the permissible uses of visual speed estimates relies on probable cause cases, we also include references to a limited number of conviction cases where comparisons are useful.

. Our colleague in dissent expresses the policy view that this reasonableness requirement “ignores the realities of traffic enforcement and unduly ties the hands of officers” because "as a practical matter” the requirement is "unworkable for police officers.” Post at 603-04, 611. Such policy considerations are best left to the legislative branch of government, which is better suited to decide them.
When a state legislature does decide to take up this issue, it may want to take note of some of the troubling implications of the dissent's view. For instance, allowing police officers to rely, without support, exclusively on their subjective impressions that a vehicle is traveling in slight excess of the legal speed limit may disincentivize the use of verifiable methods and technology. Indeed, in this case, Deputy Elliot’s vehicle was equipped with radar and he intentionally positioned himself such that it could not be used.
Furthermore, because an officer's subjective intentions for initiating a traffic stop are not relevant, see Whren, 517 U.S. at 813, 116 S.Ct. 1769 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.”), erosion of the Fourth Amendment's objective reasonableness requirement effectively eliminates any protection against profiling and arbitrary detentions. Cf. Chicago v. Morales, 527 U.S. 41, 71, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Breyer, J., concurring) ("The ordinance is unconstitutional, not because a policeman applied [ ]his discretion wisely or poorly in a particular case, but rather because the policeman enjoys too much discretion in every case”) (emphasis in original); United States v. Sokolow, 490 U.S. 1, 12, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (Marshall, J., dissenting) ("[T]he Fourth Amendment protects innocent persons from being subjected to “overbearing or harassing” police conduct carried out solely on the basis of imprecise stereotypes of what criminals look like, or on the basis of irrelevant personal characteristics such as race.”) (quoting Terry v. Ohio, 392 U.S. 1, 14-15, and n. 11, 88 S.Ct. 1868/20 L.Ed.2d 889 (1968)).

. Our colleague in dissent contends that any requirement for corroboration of an officer’s unaided visual approximation of a slight speeding violation is an unprecedented gloss on the traditional totality of the circumstances test. This Court, however, has held that where the basis for probable cause is inherently unreliable, then this basis must be corroborated such that it exhibits sufficient indicia of reliability. See, e.g., United States v. Massenburg, 654 F.3d 480, 486 (4th Cir.2011) ("Reliance on an anonymous tip may be reasonable [for Terry frisk] where, suitably corroborated, it exhibits sufficient indicia of reliability.” (quotation marks omitted)); United States v. Reaves, 512 F.3d 123, 126 (4th Cir. 2008) ("When the police rely on an anonymous tip to support reasonable suspicion, the tip must be accompanied by some corroborative elements that establish its reliability.” (quotation marks omitted)).

. To illustrate the slight differential in the time to travel a distance of 100 yards at a speed of 75 mph versus 70 mph, we need only calculate the yards per second for each speed. At 70 mph, a vehicle travels 34.22 yards per second and, thus, 100 yards in 2.92 seconds, whereas at 75 mph a vehicle travels 36.67 yards per second and, thus, 100 yards in 2.73 seconds, [yards per second — (miles per hour x 1760) -5- 3600, where 1760 is the number of yards in a mile, and where 3600 is the number of seconds in an hour. Therefore: (a) 34.22 yd/sec = (70 mph x 1760) h- 3600 and, thus, 2.92 seconds = 100 yards 4- 34.22 yd/sec; and (b) 36.67 yd/sec = (75 mph x 1760) -s- 3600; and, thus, 2.73 seconds = 100 yards h- 36.67 yd/sec]
To accept the conclusion that Deputy Elliott can visually discern that a vehicle is traveling at 75 mph in a 70-mph zone is to accept the conclusion that he can visually discern a dif *594 ferential in time of less than one-fifth of one second for a vehicle traveling 75 mph versus 70 mph over a distance that he could only approximate to be about 100 yards. Of course, this is also assuming — which the evidence does not support — that the distance traveled by Sowards's vehicle was indeed 100 yards, and, moreover, this is without consideration of Deputy Elliott’s notable and material difficulties with measurements in yards.

. Our colleague in dissent contends this conclusion is unsupported by "expert testimony, or other evidence.” Post at 604. However, in United States v. Foster, 662 F.3d 291, 295 (4th Cir.2011), cert. denied, 81 U.S.L.W. 3164 (U.S. Oct. 1, 2012) (No. 11-10744), this Court approved the use of "common sense” in "drawfing] reasonable inferences” from the record because, as Senior Judge Hamilton explained, "[t]he use of common sense is not the equivalent of fact-finding.” 662 F.3d at 298 (Hamilton, J., concurring). Indeed, "[e]ven appellate judges are endowed with brains in the hope and expectation that they will be used to obvious purpose.... There are worse fates for a judicial decision than to have it align with the practical virtues of logic and common sense.” United States v. Foster, 674 F.3d 391 (4th Cir.2012) (Wilkinson, J., concurring in the denial of rehearing en banc).
This is particularly appropriate in this context because probable cause "is not defined by bright lines and rigid boundaries” but "allows a [judicial officer] to review the facts and circumstances as a whole and make a common sense determination” whether an objectively reasonable basis exists for the challenged search or seizure. United States v. Henry, 673 F.3d 285, 290 (4th Cir.2012) (quotation marks omitted), cert. denied, 81 U.S.L.W. 3163 (U.S. Oct. 1, 2012) (No. 11-10610).

. It is worth noting that the dissent has not cited — nor have we found — a single case issued by any court at any time,, whether state or federal, finding probable cause exists to initiate a traffic stop for speeding on the sole basis of an officer's unaided visual estimate that a vehicle was exceeding the speed limit by five mph or less.

. As discussed, this and other cases in Ohio standing for the proposition that officers may use unaided visual estimates of speed for arrest, charging, and conviction have been su *596 perseded and overruled by legislation. See Ohio Rev.Code § 4511.091(C)(1).

. Indeed, in the wake of Ohio Supreme Court's decision in City of Barberton v. Jenney, *597 126 Ohio St.3d 5, 929 N.E.2d 1047 (2010), cert. denied, — U.S. -, 131 S.Ct. 517, 178 L.Ed.2d 373 (2010), which would have allowed a police officer’s unaided visual estimation to suffice for the purposes of a speeding conviction, the Ohio legislature moved swiftly to amend its existing laws to provide, subject to limited exception: "No person shall be arrested, charged, or convicted of a violation of any [speeding ordinance] based on a peace officer's unaided visual estimation of the speed of a motor vehicle.” Ohio Rev.Code § 4511.091(C)(1); see also 2011 Ohio Laws 29.
The Ohio Legislature recognized, as a practical matter, that police officers can enforce traffic safety laws in a way that simultaneously safeguards our most fundamental constitutional rights. Because our consideration here today concerns probable cause, we adhere to the traditional reasonableness standard which is far less restrictive than the per se prohibition adopted by the Ohio legislature addressing the arrest, charging, or conviction of an individual.