DAVIS, Circuit Judge,
concurring in part and in the judgment:
Judicial narratives that begin with a traffic stop are notable for their depressing sameness. Because of the nature of our judicial system, these narratives are typically inscribed in criminal prosecutions. Usually only those on whom contraband is found are charged with crimes, and those charged with crimes have the strongest incentive to challenge the stop that led to the discovery of contraband. Absent unusual events, courts tend to uphold such searches, finding them supported by probable cause.
There is no poetry in these narratives. They read like the documentation of an audit. The police go about their business. Courts double-check them. In most cases, the court finds the law enforcement officers in compliance. In the process of all that process, we forget that — at least in criminal cases — someone’s freedom is on the line.
Nancy Leong, The Open Road and the Traffic Stop: Narratives and Counter-Narratives of the American Dream, 64 Fla. L.Rev. 305, 328 (2012) (footnotes omitted) (hereafter, “Open Road ”).
In Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Supreme Court, applying the doctrine of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), definitively rejected, as inconsistent with the protections afforded by the Fourth Amendment, a claim to unfettered discretion to stop and detain motorists on the part of law enforcement officers seeking to uncover violations of the law:
[W]e hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver’s license and the registration of the automobile are unreasonable under the Fourth Amendment. This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion.
Id. at 663, 99 S.Ct. 1391. Justice Rehnquist, dissenting, discerned “[no] sufficient basis to distinguish for Fourth Amendment purposes between a roadblock stopping all cars and the random stop” at issue in the case before the Court. Id. at 667, 99 S.Ct. 1391. He scoffed at the majority’s determined effort to protect individual liberty, accusing the majority of “elevating] the adage ‘misery loves company’ to a novel role in Fourth Amendment jurisprudence.” Id. at 664, 99 S.Ct. 1391.
Seventeen years later, a unanimous Supreme Court effectively vitiated the protections afforded by Prouse. In Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Court held that so long as an officer can offer a *346 plausible account that he had probable cause a motorist committed a traffic infraction, whether the motorist could be stopped and detained was a matter entirely within the discretion of the officer.[1] Despite the potential for selective and discriminatory “traffic enforcement,” the officer’s “subjective intentions” in making the stop play no role in Fourth Amendment analysis. In particular, as the Court put it:
We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.
Id. at 813, 116 S.Ct. 1769. See generally Wayne R. LaFave, The “Routine Traffic Stop” from Start to Finish: Too Much “Routine,” Not Enough Fourth Amendment, 102 Mich. L.Rev. 1843 (2004).
Over the ensuing sixteen years, judges,[2] legal scholars, social scientists, and many others have spilled much ink (and the country has witnessed considerable political discourse) exploring the ramifications of the Court’s about-face. Specifically, we have wrestled with the inevitable role that eonstitutionally-permissible “pretextual” traffic stops play in what the Court referred to as “ordinary, probable-cause Fourth Amendment analysis,” Whren, 517 U.S. at 813, 116 S.Ct. 1769, in light of the growth of racial profiling.[3] Professor Leong has crafted a cogent summary of the evolved legal regime:
Whatever all this means in the abstract world of legal principles, the practical effect with respect to traffic stops is that when the police think a driver has committed any traffic violation, no matter how minor or how fleeting, they can pull him over. Thus, a driver might be pulled over for failing to signal for an appropriate length of time or for changing lanes too close to an intersection— things most of us routinely do on our daily commutes. The police can also pull over a driver when they lack enough evidence to establish probable cause of a violation if, under Terry, they have reasonable suspicion that criminal activity is afoot.
*347 These standards allow police officers to exercise an enormous amount of discretion in performing traffic stops. Under current doctrine, the legal justification for stopping a car need not be the same as the real reason the police officer wants to stop the car, so long as a reasonable officer would have had probable cause to believe that a traffic infraction in fact took place. [Professor] Paul Butler [now of the Georgetown University Law Center] describes riding in a police cruiser with a police officer friend and playing a game his friend invented called “Stop that Car!” in which Butler “pick[s] a car — any car — and [the officer] stops it.” Butler explains that his friend “is a good cop” because “[h]e waits until he has a legal reason to stop the car. It doesn’t take long, never more than three or four blocks of following. There are so many potential traffic infractions that it is impossible to drive without committing one.” The reality, then, is that the police are free to pick a car they wish to stop, follow it until the driver inevitably violates one of the vehicle code’s myriad obscure provisions, and subsequently pull it over.
The Supreme Court has repeatedly interpreted the Constitution to permit this schism. Thus, even an officer with no actual purpose other than to harass and annoy may — according to the Supreme Court — use a traffic stop as an entirely constitutional starting point for such actions, as long as an objectively reasonable evaluation would conclude that the officer had probable cause to believe that a traffic violation occurred at the time she made the stop.
From this starting point of an “objectively reasonable” stop supported by probable cause or reasonable suspicion, the judicial narrative then follows a well-worn script. Courts typically examine whether the circumstances justified the traffic stop, and — even more typically— answer that question in the affirmative. This is so even when the events of the traffic stop stray beyond its ostensible justification. The Court has explained: “An officer’s inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.”
Open Road at 326-27 (footnotes omitted).[4]
Of course, the four-decades-and-counting “War on Drugs” has given a special *348 context and meaning to the Whren doctrine and its implications for racial profiling. Beyond their undoubtedly sincere desire to do their jobs and to do them well and safely, local law enforcement officers and their employing agencies, such as the Statesville police department involved in this case, have serious skin in the drug interdiction game, no matter the ultimate destination of the contraband. See, e.g., Ricardo J. Bascuas, Fourth Amendment Lessons from the Highway and the Subway: A Principled Approach to Suspicion-less Searches, 38 Rutgers L.J. 719, 761-62 (2007) (discussing profits made by police from drug interdiction programs). It was not for nothing that officers York and Wolfe, each with a drug canine in his vehicle, started their shifts before nine in the morning sitting perpendicular to 1-77 watching traffic, deciding which of the many vehicles passing them by they would follow and stop, abjuring the use of the speed radar devices.[5] Likewise, it was not for nothing that, as shown on the video taken by the dashboard camera in York’s vehicle, the officers in this case expressed unmitigated glee, punctuated by serial “fist-bumps” all around, when the cache of more than two hundred grams of crack cocaine was removed from the Dodge Magnum.
All that said, this court has done (and will continue to do) what it can to hold true the line between excessive law enforcement zeal that transgresses constitutional limits, on the one hand, and legitimate law enforcement techniques respectful of constitutional constraints, on the other hand. See, e.g., United States v. Digiovanni, 650 F.3d 498 (4th Cir.2011) (affirming district court’s grant of motion to suppress evidence seized after a traffic stop). At the constitutional margins, of course, one may yet legitimately question why, as Professor Leong correctly observed (and especially as the government bears the burden of proof), close calls seem always to go to law enforcement. See, e.g., United States v. Mason, 628 F.3d 123, 132 (4th Cir.2010) (holding that questioning of motorist and passenger unrelated to the basis for the traffic stop that took “one to two minutes” did not render stop unreasonable because the stop was conducted “promptly and with efficiency”); but see id. at 134-35 (Gregory, J., dissenting) (disagreeing that duration of stop was reasonable, where detaining officer described African-American occupants of stopped car as “spooky spooky” and officer’s testimony sought to justify reasonable suspicion based on offi *349 cer’s “experience” and “sort of gut instinct”). To be sure, given the relative institutional competencies between district and circuit courts, and given the controlling standards of review of suppression rulings, see ante 128, trial judges, not the judges of this court, have the primary role in policing the police.
Our recent decision in United States v. Sowards, 690 F.3d 583 (4th Cir.2012), is wholly consistent with our on-going efforts; it lays down an important marker that there are indeed limits to the scope of law enforcement creativity inherent in the otherwise standardless Whren doctrine. Unlike the majority here, however, I cannot identify any material differences in the facts at hand that will support a difference in outcome between this case and the outcome in Sowards on the issue of uncorroborated visual speed estimates, although I fully agree that Sowards does not sound the death knell to the use of visual speed estimates by law enforcement officers.[6] Accordingly, as to the justification for the vehicle stop in this case, I join only Part II.A.2 of the majority opinion, which, as an alternative holding, sustains the district court’s determination that the ostensible following-too-elosely violation supported the existence of probable cause to effect the vehicle stop here. I also concur in Parts I, II.B., and III of the majority opinion, and in the judgment.

. This circuit anticipated Whren 's holding in United States v. Hassan El, 5 F.3d 726, 729-31 (4th Cir.1993), cert. denied, 511 U.S. 1006, 114 S.Ct. 1374, 128 L.Ed.2d 50 (1994).

. See, e.g., Atwater v. City of Lago Vista, 532 U.S. 318, 372, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (O'Connor, J.,. dissenting) ("[A]s the recent debate over racial profiling demonstrates all too clearly, a relatively minor traffic infraction may often serve as an excuse for stopping and harassing an individual.” (citing Whren, 517 U.S. at 813, 116 S.Ct. 1769)).

. At an earlier time, some law enforcement officers freely employed the term "pretextual stop” although, with increased sensitivity over racial profiling, the term seems to have fallen from favor. See United States v. Foreman, 369 F.3d 776, 786-87 (4th Cir.2004) (Gregory, J., concurring in part and dissenting in part):
Trooper Wade testified that he began to follow Foreman to "see if I could find a violation,” id. at 30 (emphasis added), and admitted "[i]n an attempt to find a violation on [Foreman's] vehicle ... I was going to conduct a pretextual stop, stop him for a traffic violation, conduct a brief interview of him, see if I observed any indicators of other criminal activity....” Id. at 60 (emphasis added). Because Trooper Wade paced Foreman's vehicle at a speed of sixty-four miles per hour over a one-half mile stretch of road where the speed limit was fifty-five, and observed "items hanging from the inside rearview mirror,” he activated his emergency lights to make the stop, which Trooper Wade admitted was pretextual. See R. vol. 4 at 2.

. For a sampling of some of the more recent literature in this genre, see Thomas B. McAffee, Setting Us Up For Disaster: The Supreme Court’s Decision in Terry v. Ohio, 12 Nev. L.J. 609, 614-15 (2012) (“The further we go along, the clearer it becomes that there is widespread 'racialized policing,’ what we have labeled as 'racial profiling,’ and that its pervasive presence is so important in part because it is measurable.... The wide use of racial profiling is reinforced by Terry's holding as well as by the way the suspicion standard has been expansively applied over time.”) (footnotes omitted); Eric J. Miller, Detective Fiction: Race, Authority and the Fourth Amendment, 44 Ariz. St. L.J. 213, 220 (2012) (observing that "the Court is aware (through both dissenting opinions and some hints in recent majority opinions) that its jurisprudence is driven by the War on Drugs, and that the style of policing it endorses to fight that war is dragnet and racialized, and that the success rate for this style of policing is low”) (footnotes omitted); Maty D. Fan, The Police Gamesmanship Dilemma in Criminal Procedure, 44 U.C. Davis L.Rev. 1407, 1463 (2011) ("In the decade since Whren, therefore, the problem of profiling has persisted while Whren stands as a controversial landmark of noninquiry and ‘a license to make racial distinctions.’ Whren is a lightning rod for controversy because the Court took a don't ask, don’t tell approach allowing police to do whatever it takes — without examining the accuracy of police beliefs about what it takes, basing deference on noninquiry *348 rules rather than data.'') (footnotes omitted); see also Bernard E. Harcourt, Rethinking Racial Profiling: A Critique of the Economics, Civil Liberties, and Constitutional Literature, and of Criminal Profiling More Generally, 71 U. Chi. L.Rev. 1275 (2004).

. Insisting that the Statesville police were engaged in "criminal interdiction'' and not merely "drug interdiction” at the time of the stop in this case, the officers' supervisor, Captain Dyson, testified at the suppression hearing that York and Wolfe were "looking for criminals” who might be driving north on I-77 that morning. J.A. 126. The cross-examination of Dyson included the following:
Q. So how do you determine whether a motorist is a criminal or not?
A. There’s a bunch of things you look at. You look at criminal indicators when they’re coming by. How they position themselves when they come by. The expression they might give or the expression they don't give. Or when they come by, somebody might just turn up a drink all of a sudden for no reason. Or when they come by — you're sitting there watching traffic. All of a sudden when the car comes by, they all of a sudden take their hand and cover their face when they come by. It's something that draws your attention to them. But you’re also looking for a motor vehicle violation.
J.A. 128.

. Interestingly, the evidence at the suppression hearing, including the officers' testimony and images from the video taken by York's dashboard camera, indicated that over the approximately five miles during which officers York and Wolfe surveilled Mubdi after they first observed the Dodge Magnum, the posted speed limits on 1-77 and 1-40 increased from fifty-five miles per hour (where the officers first observed Mubdi), to sixty miles per hour, to sixty-five miles per hour at the location where the traffic stop was finally effected. Apparently, the officers set up their “criminal interdiction” operation, in which visual estimates of vehicle speeds played a major role, at an optimal location to stop vehicles traveling more than the posted fifty-five mile per hour limit, and just before the limit increased to sixty, and then to sixty-five, miles per hour.