Filed 5/26/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>STEVEN ANDREW NICE et al.,<br><br>  Defendants and Appellants. | H041847<br>(Santa Clara County<br> Super. Ct. No. C1233969) |

Codefendants Steven Andrew Nice and Carlo Antonio Delconte appeal their convictions on drug and weapon related charges following the denial of their motion to suppress the evidence uncovered during a traffic stop. Two police officers stopped Delconte's vehicle, in which Nice was a passenger, for failing to signal before making a right turn and for speeding. Nice and Delconte both appeared to be under the influence of a stimulant. Nice admitted upon questioning that they had used methamphetamine the night before and the drugs might be in a bag in the car. Delconte and Nice were taken into custody. A tool bag on the back passenger seat contained substances found to be methamphetamine and cocaine in baggies apparently packaged for sale; ketamine, ground Dimethyltryptamine, Viagra, Cialis, Adderall, Oxycodone tablets; and a collapsible baton and two firearms, one of which was loaded. The police later conducted a search, pursuant to a search warrant, of property leased by Delconte, turning up additional firearms and narcotics.

The district attorney charged defendants with possession for sale of methamphetamine over 57 grams (Health & Saf. Code, § 11378; Pen. Code, § 1203.073,

subd. (b)(2); count 1);[1] transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a); count 2); possession for sale of cocaine (*id.*, § 11351; count 3); transportation of cocaine (*id.*, § 11352, subd. (a); count 4); possession of a controlled substance (*id.*, § 11377, subd. (b); count 5); carrying a loaded firearm in which Nice and/or Delconte was not the registered owner (§ 25850, subd. (a); count 6); possession of a firearm while under the influence (Health & Saf. Code, § 11550, subd. (e); counts 7 [Delconte] & 8 [Nice]); transportation of an assault weapon (§ 30600, subd. (a); count 9); and possession of methamphetamine while armed with a loaded firearm (Health & Saf. Code, § 11370.1; count 10). As to counts 1 through 4, the information further alleged that Nice and Delconte were personally armed with a firearm (§ 12022, subd. (c)).

Delconte, joined by Nice, moved to suppress the evidence (§ 1538.5) arguing the officer lacked reasonable suspicion for the vehicle stop. The trial court denied the motion to suppress and defendants each entered into a negotiated plea agreement. Nice pleaded no contest to counts 1, 3, and 8 with enhancements as charged. Delconte pleaded no contest to counts 1, 3, 7, and 9 with enhancements as charged. The trial court sentenced each defendant on the plea charges and dismissed the remaining charges. As to Nice, the trial court suspended imposition of sentence and granted three years of supervised probation, including one year in county jail. As to Delconte, the trial court denied probation and imposed a term of six years in state prison, based on the midterm for count 9, and imposed concurrent terms for the other plea counts.

On appeal, defendants argue the trial court erred in denying their motion to suppress. Nice also challenges one of his probation conditions as unconstitutionally vague and overbroad.

For the reasons set forth below, we find the trial court did not err in denying the motion to suppress. We agree with Nice that certain parts of the probation condition

_____

[1] Unspecified statutory references are to the Penal Code.

2

should be modified.  We will affirm the judgment as to defendant Delconte, and we will affirm the judgment as modified as to defendant Nice.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  WARRANTLESS SEARCH AND SEIZURE

Our summary of the facts is taken from the testimony at the preliminary hearing and suppression hearing.  Between April and June 2012, San Jose police officers responded to approximately 10 calls complaining of generator noise, fumes, and parked cars on a lot in a residential neighborhood in the vicinity of Leigh Avenue and Rosswood Drive in San Jose.  City of San Jose Police Officer Marc Beretta responded to two such calls on June 2, 2012.  Officer Beretta spoke with Delconte, who answered the officer's knock on the gate and said he was leasing the property and the parked cars belonged to him.

The next day, June 3, 2012, Officer Beretta returned to the area on patrol with his partner.  The officers were in uniform, driving a marked patrol vehicle, and were stopped on the north curb line of Rosswood Drive, in the middle of the block between Leigh Avenue and Tilden Drive.  Officer Beretta noticed a white Chevy car pass "fairly quickly," heading west toward Tilden Drive.  Officer Beretta recognized the car from the service call the day before.  As the white Chevy passed the police vehicle, Officer Beretta saw the driver look in the rearview mirror at him; the car then made a "quick right turn" northward on Trent Drive, the first street after Tilden, without using its turn signal.

Officer Beretta pulled his vehicle off the curb and followed, intending to make a traffic stop.  As Officer Beretta turned right on Trent Drive, the white car was somewhere between halfway down the block and the end of the block.  At the preliminary hearing, Officer Beretta described the car at the point that he turned onto Trent Drive as "already northbound almost getting ready to make the turn around the cul-de-sac [at the end of Trent Drive]."  At the hearing on the motion to suppress, several months later, Officer Beretta described the white car at that moment as "a little more probably than halfway

3

down the block," estimated midblock or close to the end.  Officer Beretta had not yet activated his overhead lights or siren.

Officer Beretta testified that the streets in the area run perpendicular to each other and form a rectangle or large U-turn, with sharp right turns from Trent Drive onto Troy Park Place, and from Troy Park Place onto Tilden Drive, which connects back to Rosswood Drive.  Officer Beretta estimated Trent Drive to be about 1000 feet long and Troy Park Place about 500 feet long.

Officer Beretta had taken a 40-hour in-house speed radar estimation class and had probably completed at least a thousand speed estimations with or without radar during his 14 years as a police officer.  His training and field experience included taking visual speed estimates while standing still, as well as while moving.  He acknowledged it was more difficult, but still possible, to visually estimate the speed of a car while he was also moving.  He had been taught a formula to use when estimating speeds without radar but did not use or recall the formula while following the white Chevy.

Based on the location of the white car and on Officer Beretta's own speed, he estimated the white car was moving at about 35 or 40 miles per hour.  Officer Beretta had to accelerate to about 35 miles per hour in order to get close enough to activate his lights towards the end of Trent Drive, as the white car was making the turn from Troy Park Place to Tilden Drive.  Officer Beretta either checked his speedometer or knew his own speed by estimation.  Officer Beretta testified that the white car would have slowed for the perpendicular right turns, but he was trained to maintain a turning speed of 35 miles per hour and knew "for certain" that he was going over 25 miles per hour while making the right turns.  The white car pulled over on Trent Drive, about 50 feet south of Troy Park Place.  The speed limit in the residential area was 25 miles per hour.

Officer Beretta approached the vehicle and made contact with the driver, Delconte, who appeared nervous and fidgety.  Officer Beretta believed Delconte was exhibiting signs of stimulant influence.  He asked Delconte to exit the vehicle and

4

performed a series of tests, confirming Delconte's pupils were dilated and internal body clock and pulse were accelerated. The front passenger, Nice, exhibited the same symptoms. Officer Beretta questioned Nice about drug use and if there were drugs in the car.[2] Nice admitted that he had used methamphetamine the night before and the drugs were in a black bag or suitcase on the back passenger seat. Officer Beretta performed the same tests on Nice, confirming his symptoms. The officers placed defendants into custody.

A subsequent vehicle search revealed a black tool bag on the back passenger seat containing methamphetamine packed in individual baggies, individual baggies of cocaine, four glass vials of Ketamine, ground Dimethyltryptamine, blister packs of Viagra tablets, and Cialis, Adderall, and Oxycodone tablets. The tool bag also contained an Intratec TEC-9 assault weapon that was not registered to either defendant, a loaded 9-millimeter pistol, a collapsible police baton, two digital scales, 19 one-hundred dollar bills, empty plastic baggies, paper cupcake cups, and a large glass pipe with methamphetamine residue on it.

Pursuant to a search warrant obtained later that day for the nearby lot leased by Delconte, Officer Beretta and other officers found a loaded .22-caliber handgun, two 12-guage shotgun rounds, ammunition, baggies with a white crystalline substance resembling methamphetamine, a box filled with glass smoking pipes, hypodermic needles, Viagra, .357-Magnum ammunition, .380-caliber ammunition, and a digital scale. Defendants' blood samples taken after their arrest both tested positive for methamphetamine.

---

[2] Officer Beretta's questions to Nice took place before Nice was placed into custody and before any *Miranda* warnings. (*Miranda v. Arizona* (1966) 384 U.S. 436.)

## B. PROCEDURAL HISTORY

The Santa Clara County District Attorney filed a first amended information on June 4, 2014, charging Delconte and Nice as follows: possession for sale of methamphetamine (Health & Saf. Code, § 11378) in an amount of 57 grams or more (§ 1203.073, subd. (b)(2)) while personally armed with a firearm (§ 12022, subd. (c); count 1); transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)) while personally armed with a firearm (§ 12022, subd. (c); count 2); possession for sale of cocaine (Health & Saf. Code, § 11351) while personally armed with a firearm (§ 12022, subd. (c); count 3); transportation of cocaine (Health & Saf. Code, § 11352, subd. (a)) while personally armed with a firearm (§ 12022, subd. (c); count 4); possession of a controlled substance (Health & Saf. Code, § 11377, subd. (b); count 5); carrying a loaded firearm in which Nice and/or Delconte was not the registered owner (§ 25850, subd. (a); count 6); possession of a firearm while under the influence (Health & Saf. Code, § 11550, subd. (e); counts 7 [Delconte] & 8 [Nice]); transportation of an assault weapon (§ 30600, subd. (a); count 9); and possession of methamphetamine while armed with a loaded firearm (Health & Saf. Code, § 11370.1; count 10).

Delconte filed a motion to suppress the evidence on July 2, 2014, in which Nice joined. Delconte contended the traffic stop was without reasonable suspicion and constituted an unlawful search and seizure. The People opposed the motion to suppress, arguing the stop was to investigate two traffic violations: the turn onto Trent Drive without use of a turn signal; and Officer Beretta's trained estimate, based on the distance the car had traveled in the time he observed it, that the white Chevy was speeding at 35 to 40 miles per hour in a 25 mile per hour zone.

The trial court conducted an evidentiary hearing on September 5, 2014. Counsel for both defendants indicated the suppression motion was limited to the reasons for the vehicle stop. The People relied solely on the alleged speeding violation to justify the stop and called Officer Beretta as their only witness. The defense introduced the testimony of

6

Michael Yore, a private investigator and former police officer who measured the area and drove the route at different speeds. Yore testified that the measured distance from the northeast corner of Rosswood Drive to Troy Park Place, where the estimate of speed occurred, was 824 feet. During his speed tests, it took him approximately 20 seconds to cover that distance driving 25 miles per hour and approximately 15 seconds while driving 35 miles per hour. Yore also tested and found that it took him five seconds to pull away from the curb on Rosswood Drive midway between Tilden Drive and Trent Drive and get to the corner of Rosswood and Trent. Yore did not have another vehicle drive the route while he tried to visually estimate the speed.

The People argued that Yore's calculations were consistent with their position because it would have taken Officer Beretta five to eight seconds to move from the curb line of Rosswood between Leigh and Tilden to the corner of Trent and Rosswood, such that when he got to the corner, he would see the white car about halfway down Trent if it was traveling at 35 miles per hour, as Officer Beretta had estimated. The defense countered that this did not account for the extra time it would have taken Officer Beretta to travel from his starting position between Tilden and Leigh on Rosswood, past Tilden, to the corner of Trent and Rosswood. Accounting for this additional time, the defense argued, would place the defendants' car about midway or close to the end of Trent Drive if traveling at the speed limit.

The trial court denied the suppression motion. In a written order on September 9, 2014, the court explained its findings: "Officer Beretta[] has extensive experience and expertise in performing speed estimations. His estimate here that defendants' car was traveling 35-40 miles per hour, based on first-hand observations of the driving, is sufficient to raise a reasonable articulable suspicion that the car was in violation of the 25 mile per hour speed limit for residential areas. Officer Beretta consequently had a valid basis to perform a car stop."

7

On September 10, 2014, Delconte and Nice entered their plea agreements. Nice pleaded no contest to counts 1, 3, and 8 with enhancements as charged. Delconte pleaded no contest to counts 1, 3, 7, and 9 with enhancements as charged. On December 5, 2014, the trial court suspended imposition of sentence as to Nice and ordered three years of supervised probation, including one year in county jail. Among the probation conditions imposed by the trial court was the prohibition that Nice "shall not possess or use any illegal drugs or illegal controlled substances or go anywhere you know illegal drugs are not prescribed or controlled substances are being used or sold." The probation report phrased the second part of this prohibition differently, stating that Nice shall not "go anywhere he/she knows illegal drugs or non-prescribed controlled substances are used or sold." Nice filed a timely notice of appeal on January 9, 2015. Also on December 5, 2014, the trial court denied probation for Delconte, imposed a term of six years in state prison based on the midterm for count 9, and imposed concurrent midterm sentences for counts 1, 3 and 7. Delconte filed a timely notice of appeal on January 6, 2015.

## II. DISCUSSION

### A. MOTION TO SUPPRESS AS TO BOTH DEFENDANTS

#### 1. Legal Framework

A traffic stop is a seizure subject to the protections of the Fourth Amendment of the United States Constitution. (*Berkemer v. McCarty* (1984) 468 U.S. 420, 436.) We evaluate the legality of the traffic stop under the rubric of federal constitutional law (*People v. White* (2003) 107 Cal.App.4th 636, 642) which requires "only reasonable suspicion in the context of investigative traffic stops." (*U.S. v. Lopez-Soto* (9th Cir. 2000) 205 F.3d 1101, 1105.) "Reasonable suspicion a law has been violated can be based on less than probable cause to believe a violation has occurred but it cannot be based on mere speculation or hunch." (*People v. Rodriguez* (2006) 143 Cal.App.4th 1137, 1148, citing *People v. Wells* (2006) 38 Cal.4th 1078, 1083.) Reasonable suspicion " ' "requires specific, articulable facts which, together with objective and reasonable inferences, form

8

a basis for suspecting that a particular person is engaged in criminal conduct." ' " (*People v. White*, *supra*, at p. 641, quoting *U.S. v. Twilley* (9th Cir. 2000) 222 F.3d 1092, 1095.) "An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also 'be grounded in objective facts and be capable of rational explanation.' " (*U.S. v. Lopez-Soto*, *supra*, at p. 1105.) Accordingly, a lawful traffic stop occurs when the facts and circumstances known to the police officer support at least a reasonable suspicion that the driver has violated the Vehicle Code or another law. (*People v. Miranda* (1993) 17 Cal.App.4th 917, 926; *People v. Superior Court* (1972) 7 Cal.3d 186, 200; *Terry v. Ohio* (1968) 392 U.S. 1, 16-19.)

Our review of a trial court's ruling on a motion to suppress the evidence from such a stop is well established. "A warrantless search is presumed to be unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search. . . . 'We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' " (*People v. Redd* (2010) 48 Cal.4th 691, 719.)

### 2. Analysis

Defendants contend the trial court erred in denying the suppression motion because the prosecution failed to establish that Officer Beretta had a legally sufficient basis to make the traffic stop. They argue that Officer Beretta's observations did not raise a reasonable articulable suspicion that the car was traveling 35 to 40 miles per hour in violation of the 25 mile-per-hour speed limit. The People respond that Officer Beretta had extensive experience estimating car speeds, including while driving, and could credibly assess that the white Chevy was traveling faster than his patrol car when it was moving at speeds between 25 and 35 miles per hour.

9

We defer to the trial court's factual finding that Officer Beretta had extensive experience and expertise in performing speed estimations, which defendants do not challenge and which we find was supported by substantial evidence. (*People v. Redd*, *supra*, 48 Cal.4th at p. 719.) Defendants argue that Officer Beretta's training and experience was not enough, however, due to the poor conditions under which he made his estimate. Defendants point to several facts that arguably undermined the accuracy of Officer Beretta's speed estimate and required some corroborating evidence or additional indicia of reliability to support a finding of reasonable suspicion. First, Officer Beretta estimated the speed of the white car when he had just caught sight of it (after turning the corner from Rosswood onto Trent Drive) and while he was accelerating out of the turn and possibly estimating his own speed. Second, he could not identify exactly how far the white car had traveled but only that it was between mid-block and the end of Trent Drive. Third, he did not use or remember the formula taught to visually estimate speed. Officer Beretta also acknowledged that estimating speed while moving was more difficult than at a standstill.

As defendants duly acknowledge, few published California cases address reasonable suspicion in relation to a traffic stop based on visual estimation of speed. However, in *People v. Ramirez* (1997) 59 Cal.App.4th 1548 (*Ramirez*), the appellate court affirmed judgment against the defendant for drug charges after finding sufficient cause for a traffic stop by an officer based on another officer's report that the defendant was speeding. (*Id*. at pp. 1551-1552.) The officer who reported the speeding violation was a narcotics agent who followed the defendant's car from a surveillance point at a distance of 50 to 75 yards and estimated defendant's speed at 40 to 45 miles per hour in a 25 mile-per-hour residential area, though the officer did not check his speedometer or use radar. (*Ibid*.) A different officer made the stop based on the first officer's radio call. The defendant on appeal only challenged the arresting officer's lack of personal knowledge as a lawful basis to initiate the traffic stop. (*Id*. at p. 1553.) In explaining that

10

the arresting officer could properly rely on the collective knowledge of other officers for the stop, the appellate court stated that the first officer "had a very strong basis for his probable cause because he himself witnessed appellant's driving behavior, and his inference appellant was breaking a speed limit was reasonable from his [nine years of] experience as a police officer." (*Id*. at p. 1555.) Though expressed as dictum, this conclusion in *Ramirez* bolsters the general proposition that an officer's experience estimating speeds, combined with the officer's direct observation of driving, can furnish the reasonable basis for an investigatory stop. (*Ibid*.)

Other California cases are not on point or had additional evidence corroborating the visual speed estimate. For example, in *People v*. *Dachino* (2003) 111 Cal.App.4th 1429, 1430-1431, two police officers stopped the defendant after observing he was driving at an "unsafe speed" estimated to be 35 miles per hour in a 25-mile-per-hour residential zone. The appellate court did not reach the issue of whether the officers' visual estimate was reasonable, because the trial court had erroneously denied the suppression motion based on the defendant's purported lack of standing. (*Id*. at pp. 1432-1433.) A panel of this court in *People v*. *Hardacre* (2004) 116 Cal.App.4th 1292 affirmed a drunk driving conviction after finding, in relevant part, that the highway patrol officer had reasonable suspicion to stop the defendant based on his visual estimate that the defendant was driving 40 miles per hour in a 25 mile-per-hour zone. (*Id*. at pp. 1300-1301.) But in that case, the officer also employed his radar unit, which showed the defendant was driving between 44 and 50 miles per hour. (*Ibid*.) And in *People v*. *Zunis* (2005) 134 Cal.App.4th Supp. 1, 3, the appellate court affirmed a judgment for speeding based on an officer's visual estimate from the air that the defendant was driving 105 miles per hour, which the officer then corroborated using a stopwatch and highway mile markers. The defendant challenged the sufficiency of the evidence offered to support the speeding conviction, including because the officer had been trained to perform visual estimates from the ground, not the air, and had admitted to a

11

five mile-per-hour error factor. (*Id*. at p. Supp. 6.) The appellate court found these facts did not disturb the conviction because they affected the weight of the evidence, which the trial court presumably had accounted for in evaluating the officer's visual estimate. (*Ibid*.)

Citing the paucity of California decisions that address reasonable suspicion in the context of a visual speed estimate, defendants rely on *U.S. v. Sowards* (4th Cir. 2012) 690 F.3d 583 (*Sowards*), in support of their argument that Officer Beretta's bare estimate of speed was not enough. Like here, the suppression motion in *Sowards* challenged a traffic stop for speeding in which the police officer visually estimated the defendant's speed. (*Id*. at p. 585.) The Fourth Circuit Court of Appeals found the officer's estimate insufficient to justify the stop and more broadly rejected "the proposition that an officer's visual speed estimate, in and of itself, will always suffice as a basis for probable cause to initiate a traffic stop."[3] (*Id*. at p. 591.) The court pronounced a framework to guide the determination of whether a stop requires something more: "[T]he reasonableness of an officer's visual speed estimate depends, in the first instance, on whether a vehicle's speed

---

[3] The *Sowards* court referred to probable cause as the standard for a lawful traffic stop under the Fourth Amendment, citing *Whren v. United States* (1996) 517 U.S. 806, 810. (*Sowards*, *supra*, 690 F.3d at p. 587.) However, we find the analysis of the Ninth Circuit Court of Appeals in *U.S. v. Lopez-Soto* persuasive on this point, which held that the Fourth Amendment requires "only reasonable suspicion in the context of investigative traffic stops." (*U.S. v. Lopez-Soto*, *supra*, 205 F.3d at p. 1105.) *U.S. v. Lopez-Soto* specifically considered "whether reasonable suspicion or the higher standard of probable cause is required to support an investigatory traffic stop under the Fourth Amendment" and noted that a traffic stop consistently has been held " 'more analogous to a so-called *Terry* stop than to a formal arrest.' " (*Id*. at p. 1104, quoting *Berkemer v. McCarty*, *supra*, 468 U.S. at p. 439.) The court further stated, "We do not believe that the [Supreme Court's decision in *Whren*] intended to change this settled rule," because in that case the parties agreed the police had probable cause to make the traffic stop. (*U.S. v. Lopez-Soto*, *supra*, at p. 1104.) Also, the court noted that the passage in *Whren* referencing probable cause "tells us only that probable cause is sufficient to support a traffic stop, not that it is necessary." (*Ibid*.)

is estimated to be in significant excess or slight excess of the legal speed limit. If slight, then additional indicia of reliability are necessary to support the reasonableness of the officer's visual estimate." (*Ibid*.) This reasonableness framework is persuasive but not controlling as a means of analyzing whether the facts present in our case supported a finding of reasonable suspicion to justify the stop. (*People v. Camacho* (2000) 23 Cal.4th 824, 837 [federal appellate court decisions are persuasive but not controlling in analyzing a federal question]; *Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 879 [same].)

Applying the *Sowards* framework, we find the facts distinguishable. The deputy in *Sowards* estimated the defendant was driving five miles per hour over a high threshold speed limit (estimated 75 mph in a 70 mph zone) (*Sowards*, *supra*, 690 F.3d at p. 585), whereas Officer Beretta estimated the white Chevy was driving between 10 and 15 miles per hour over a lower threshold speed limit (estimated 35 or 40 mph in a 25 mph zone), in a residential area. The difference is significant—between an estimated 40 to 60 percent faster in this case, as opposed to about 7 percent faster in *Sowards*.[4] In our view, this places Officer Beretta's estimate closer to "in significant excess" of the speed limit on the spectrum proposed in *Sowards*. In addition, the trial court in *Sowards* credited the deputy's "visual observation" of the car traveling toward him based on its finding that the deputy was "trained to estimate speeds" and had obtained certification that "depended on accuracy in estimating speeds." (*Sowards*, *supra*, 690 F.3d at p. 587.) The circuit court deemed this finding erroneous because the deputy's training was specific to the use of a

---

[4] An estimated five mile-per-hour excess divided by a 70 mile-per-hour speed limit renders the estimated excess in *Sowards* to be about 7 percent above the speed limit ($5 \div 70 = 0.0714$). An estimated 10 mile-per-hour excess divided by a 25 mile-per-hour speed limit renders the low end of the estimated excess in our case to be 40 percent above the speed limit ($10 \div 25 = 0.4$). An estimated 15 mile-per-hour excess divided by a 25 mile-per-hour speed limit renders the high end of the estimated excess in our case to be 60 percent above the speed limit ($15 \div 25 = 0.6$).

13

radar unit, and in obtaining certification, the deputy only had to " '*guess*' the speed of twelve vehicles . . . within a [combined] total margin of error of 42 mph for all twelve of those vehicles." (*Id*. at pp. 588-589.)  In contrast, Officer Beretta testified to 40 hours of radar certification training, which included training on visual speed estimations and allowed only a five mile-per-hour margin of error.  Officer Beretta's training and field experience also included taking visual speed estimates while moving, and numbered "probably a thousand at least" visual speed estimations in the field.  Unlike *Sowards*, we find no error in the trial court's finding that Officer Beretta had "extensive experience and expertise in performing speed estimations" and we do not believe the estimate of 35 or 40 miles per hour in a 25 mile-per-hour zone was in "slight excess of the legal speed limit" so as to foreclose a finding of reasonable suspicion based on the visual estimate.

The scenarios and range of cases discussed in *Sowards* generally support this conclusion.  The court in *Sowards* acknowledged, for example, "that 'an officer's visual estimation can supply probable cause to support a traffic stop for speeding *in appropriate circumstances*.' " (*Sowards*, *supra*, 690 F.3d at p. 591, quoting *U.S. v. Ludwig* (10th Cir. 2011) 641 F.3d 1243, 1247.)  In *U.S. v. Ludwig*, the Tenth Circuit Court of Appeals affirmed the denial of a suppression motion based in part on a traffic stop for speeding, noting "the district court found the trooper's visual estimate [that defendant was driving at 10 miles over the speed limit on an interstate] credible and we are given no reason to believe otherwise." (*U.S. v. Ludwig*, *supra*, at p. 1247.)  The *Sowards* court also acknowledged that "where an officer estimates that a vehicle is traveling in significant excess of the legal speed limit, the speed differential—i.e., the percentage difference between the estimated speed and the legal speed limit—may itself provide sufficient 'indicia of reliability' to support an officer's probable cause determination." (*Sowards*, *supra*, at p. 591.)  Thus, in *State v. Butts*, the Kansas Court of Appeals found reasonable suspicion where an officer visually estimated a vehicle speed of "about 45 miles per hour

14

in a 30-mile-per-hour speed zone" as it traveled on the same street but in the opposite direction of the patrol vehicle. (*State v. Butts* (2012) 46 Kan.App.2d 1074, 1076.) The Kansas court viewed the 15-mile-per-hour excess under the circumstances "as significantly higher than the posted speed limit and, as a result, a difference that would be discernable to an observant and trained law enforcement officer." (*Id.* at p. 1087.) But "where an officer estimates that a vehicle is traveling in only slight excess of the legal speed limit, and particularly where the alleged violation is at a speed differential difficult for the naked eye to discern, an officer's visual speed estimate requires additional indicia of reliability to support probable cause." (*Sowards*, *supra*, at p. 592.) Thus, in *City of Kansas City v. Oxley*, the Supreme Court of Missouri rejected as insufficient an officer's uncorroborated opinion that the defendant was driving 45 miles per hour in a 35 mile-per-hour zone. (*City of Kansas City v. Oxley* (1979) 579 S.W.2d 113, 115-116.) The Missouri court found the "variance between the estimated speed and the posted speed was not great" and noted that the officer observed the defendant when he was a block and a half away, that there was no evidence the officer kept the defendant in view, followed the vehicle, or otherwise tried to corroborate his estimate. (*Id.* at p. 116.)

By comparison, stated in terms of speed differentials, Officer Beretta's estimate that defendants were traveling between 40 and 60 percent over the speed limit aligns closely to the estimate in *State v. Butts*, which the court found would be discernable to a trained and observant officer, and is greater than the estimate in *City of Kansas City v. Oxley*, which the court found to be insufficient.[5] Extending this analytic tool to the *Ramirez* case discussed earlier, we note the speed differential in our case was slightly

---

[5] The estimated speed differential in *State v. Butts*, *supra*, 46 Kan.App.2d 1074 was 50 percent (estimated 15 mph excess in a 30 mph zone ($15 \div 30 = 0.50$)), whereas in *City of Kansas City v. Oxley*, *supra*, 579 S.W.2d 113, it was about 28 percent (estimated 10 mph excess in a 35 mph zone ($10 \div 35 = 0.286$)).

lower (estimated 35 to 40 mph in a 25-mph zone), as compared to in *Ramirez, supra*, 59 Cal.App.4th 1548 (40 to 45 mph in a 25-mph zone), but other factors involving the visual speed assessment were similar, including that the officer's vehicle was in motion and following the vehicle, and that the officer drew on his years of experience in visually estimating the speed. (*Id.* at p. 1553.)

This is not to suggest a purely formulaic approach to the trial court's evaluation of whether an officer's uncorroborated, visual speed estimate provides a reasonable suspicion to support an investigative stop. Whether the estimated speed is in slight or significant excess of the speed limit may set a baseline; it does not define the scope of the court's inquiry. (See *Sowards, supra*, 690 F.3d at p. 591 [defining inquiry "in the first instance"].) Here, the trial court cited Officer Beretta's experience and expertise in making visual speed estimates as well as his first-hand observation of the driving. Defendants challenge the reliability of the first-hand observation because Officer Beretta's car also was moving, he was not able to state precisely how far down Trent Drive the white car had traveled by the time he turned right from Rosswood onto Trent, and he did not use or remember the formula he had been taught. Defendant Nice contends these facts form "the poorest of conditions" from which Officer Beretta operated at the time he estimated defendants' speed and prevented any reasonable determination that the white car was speeding. The People respond that Officer Beretta's estimate was supported by observable facts, including his own speed, which he knew was at or above the speed limit, the distance the white car had traveled by the time the officer turned onto Trent Drive, and whether Officer Beretta was falling behind, keeping up with, or gaining on defendants as he followed their car.

We find the conditions under which Officer Beretta made his estimate do not bar a finding of reasonable suspicion based on the sum of facts and circumstances known to the officer. It is evident from the ruling on the motion to suppress that the trial court credited Officer Beretta's testimony, despite minor inconsistencies, which placed defendants' car

16

somewhere between the middle and end of Trent Drive by the time the officer turned the corner, estimated defendants' speed at between 10 and 15 miles per hour over the residential speed limit, and estimated or viewed his own speed at 35 miles per hour or greater as he followed the car, and at greater than 25 miles per hour on the sharp turns from Trent Drive to Troy Park Place and again onto Tilden, where he effectuated the stop.  Taken together, Officer Beretta's first-hand observations of the white car as he pursued it, his pertinent training and experience, and the estimated speed differential, comprise sufficient objective and articulable facts to support the trial court's finding of reasonable suspicion that defendants' vehicle was traveling above the speed limit for the residential area.  (See *People v. Rodriguez*, *supra*, 143 Cal.App.4th at p. 1149 [reasonableness of traffic stop is judged against an objective standard based on the facts then available to the officer].)

We conclude that Officer Beretta's visual estimate of defendants' speed as he also was moving was sufficiently grounded in objective facts to constitute reasonable suspicion that the white Chevy was speeding.  The trial court did not err in denying defendants' motion to suppress the evidence seized as a result.  Having so concluded, we need not address defendants' arguments regarding the alleged lack of a turn signal, which the People have not pursued as a basis for the stop.

### B. PROBATION CONDITION AS TO DEFENDANT NICE

Nice contends the probation condition concerning possession of illegal drugs or illegal controlled substances and not going anywhere he knows illegal drugs are being used or sold is unconstitutionally vague and overbroad.  The trial court stated on the record:  "You shall not possess or use any illegal drugs or illegal controlled substances or go anywhere you know illegal drugs are not prescribed or controlled substances are being used or sold."  The probation report proposed this same condition slightly differently:  "[Nice] shall not possess or use illegal drugs or illegal controlled substances or go anywhere he[] knows illegal drugs or non-prescribed controlled substances are used or

17

sold." Nice raises three issues with the probation condition. We address each issue separately.

### 1. Legal Framework

" 'In granting probation, courts have broad discretion to impose conditions to foster rehabilitation and to protect public safety . . . .' (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120.) 'The trial court's discretion, although broad, nevertheless is not without limits.' (*Id.* at p. 1121.)" (*People v. Perez* (2009) 176 Cal.App.4th 380, 383 (*Perez*).) The objections of vagueness and overbreadth are often raised together but are "conceptually quite distinct." (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153.)

"[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.) A probation condition so vague that men and women of common intelligence must guess at its meaning and differ as to its application violates " 'the due process concepts of preventing arbitrary law enforcement and providing adequate notice' " to the probationer. (*Ibid.*) "A probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness." (*Ibid.*)

"The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights . . . ." (*In re E.O.*, *supra*, 188 Cal.App.4th at p. 1153.) "A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad." (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.) "A narrow condition that achieves rehabilitation should be used in place of broad conditions that prevent otherwise lawful conduct and necessary activities." (*Perez*, *supra*, 176 Cal.App.4th at p. 384.)

We note as a threshold matter that Nice did not forfeit these constitutional claims by failing to challenge the constitutionality of the probation condition in the trial court because the issues presented can be resolved as a matter of law without reference to the sentencing record in the trial court. (*In re Sheena K.*, *supra*, 40 Cal.4th at pp. 888-889.) Our review of a constitutional challenge to a probation condition is de novo. (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

### 2. Analysis

#### a. Possession or use of illegal drugs or illegal controlled substances

Nice argues the condition prohibiting him from possessing or using illegal drugs is impermissibly vague because it fails to contain an express knowledge requirement and thereby fails to provide notice whether accidental conduct will violate the condition. He also argues the condition is overbroad because it can be interpreted to infringe on his right to possess property, i.e., to borrow a friend's car because the friend might have illegal drugs in the car. The People agree the condition should be modified to add a knowledge requirement.

This court considered a similar probation condition in *People v. Rodriguez* (2013) 222 Cal.App.4th 578 (*Rodriguez*) and concluded that an express knowledge requirement was not required. (*Id.* at p. 593.) The condition challenged in *Rodriguez* provided that the defendant " '[n]ot use or possess alcohol, intoxicants, narcotics, or other controlled substances without the prescription of a physician . . . .' " (*Id.* at p. 592.) Applying the same reasoning as underscores other criminal offenses for which case law has established implicit scienter elements, we found that a knowledge requirement was "reasonably implicit" in the probation condition pertaining to possession or use of controlled substances. (*Id.* at p. 593.) "Division 10 of the Health and Safety Code is the California Uniform Controlled Substances Act. (Health & Saf. Code, § 11000 et seq.) Case law has construed these statutes as including implicit knowledge elements. '[A]lthough criminal statutes prohibiting the possession, transportation, or sale of a controlled substance do not

19

expressly contain an element that the accused be aware of the character of the controlled substance at issue . . . , such a requirement has been implied by the courts.' " (*Ibid.*) However, *Rodriguez* determined the proscriptions at issue were not "limited to substances regulated by statute, but extend[ed] to alcohol and the generic 'intoxicants.' " (*Id.* at p. 594.) The court concluded that "[b]ecause the latter category is susceptible of different interpretations, which may include common items such as adhesives, bath salts, mouthwash, and over-the-counter medicines, the addition of an express knowledge requirement [would] eliminate any potential for vagueness or overbreadth in applying the condition." (*Ibid.*, fn. omitted.)

In contrast with the broader proscriptions at issue in *Rodriguez*, defendant Nice is prohibited from "possess[ing] or us[ing] any *illegal* drugs or *illegal* controlled substances. . . ." (Italics added.) The condition is limited to conduct regulated by the California Uniform Controlled Substances Act and is not susceptible to various interpretations. Insofar as the condition prohibits defendant from using or possessing illegal drugs or illegal controlled substances already proscribed by statute, we conclude it "is implicit . . . that possession of a controlled substance involves the mental elements of knowing of its presence and of its nature as a restricted substance." (*Rodriguez*, *supra*, 222 Cal.App.4th at p. 593.) Accordingly, Nice's argument that he could be found in violation due to unknowing possession or consumption of illegal drugs is without merit.

We note that since the *Rodriguez* decision, the First District Court of Appeal addressed the question of an implied knowledge requirement somewhat differently in two cases in which the California Supreme Court has granted review. (See *People v. Hall* (2015) 236 Cal.App.4th 1124, 1127, rev. granted Sep. 9, 2015, S227193 [probation condition prohibited possession or use of " 'illegal drugs, narcotics' "] and *People v. Gaines* (2015) 242 Cal.App.4th 1035, 1037-1038, rev. granted Feb. 17, 2016, S231723

20

[probation condition prohibited use or possession of " 'any narcotics, dangerous drugs or narcotic paraphernalia' "].)[6] Pending guidance from our high court on this issue, we continue to abide by the reasoning stated in *Rodriguez*. Therefore, no modification is necessary and we need not accept the People's concession on this point. (*People v. Kim* (2011) 193 Cal.App.4th 836, 847.)

### b. *Presence in a location where illegal drugs "are not prescribed"*

Next, Nice argues the trial court's oral pronouncement that Nice shall not go anywhere he knows "illegal drugs are not prescribed or controlled substances are being used or sold" is vague and hard to understand. The People agree and propose this court modify the language to reflect the probation report, which recommended Nice "shall not possess or use illegal drugs or illegal controlled substances or go anywhere he[] knows illegal drugs or non-prescribed controlled substances are used or sold."

We agree that the trial court's admonishment as stated does not give Nice fair warning of where he can go because, by definition, illegal drugs are not prescribed, and hence taken literally, the condition could prohibit going anywhere. To the extent this part of the probation condition requires persons of common intelligence to guess at its meaning and intended application, we conclude it is vague and requires modification. (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.) We conclude that the probation condition should be modified to conform to the clearer phrasing in the probation report. This does not end our inquiry, however, because Nice also challenges the part of the probation

---

[6] The Supreme Court stated in granting review of *People v. Hall*: "This case presents the following issues: (1) Are probation conditions prohibiting defendant from: (a) 'owning, possessing or having in his custody or control any handgun, rifle, shotgun or any firearm whatsoever or any weapon that can be concealed on his person'; and (b) 'using or possessing or having in his custody or control any illegal drugs, narcotics, narcotics paraphernalia without a prescription,' unconstitutionally vague? (2) Is an explicit knowledge requirement constitutionally mandated?"

condition barring him from going anywhere he knows illegal drugs or non-prescribed controlled substances are used or sold, as unconstitutionally vague and overbroad.

### c. *Presence where illegal drugs or non-prescribed controlled substances are used or sold*

Nice argues the condition is vague because it fails to make clear what conduct is prohibited, specifically how far he must remain from places where illegal drugs are being used or sold, and whether he must avoid places where illegal drugs have ever been used or sold as opposed to where they are currently being used or sold. For example, can Nice walk through downtown Santa Cruz if he knows illegal drugs are used and sold on those streets? Must he leave the beach if he smells marijuana, and if so, at what point can he return? If he learns of a park cleanup in which volunteers found hypodermic needles and evidence of drug use, can Nice visit that park?

Nice also argues the condition is overbroad because it restricts his constitutional right to travel, requiring him to stay away from more places than needed to ensure the purpose of the condition. For example, Nice argues that without a specified distance or time frame, in order to comply he will need to avoid all places where he knows illegal drug activity takes place, such as public parks, beaches, and music concerts. Nice argues this part of the condition should be struck or remanded to the trial court for clarification. The People respond that Nice's interpretation is unreasonably expansive. They urge that additional limits are not needed because the knowledge requirement provides fair notice of the places Nice must avoid and protects Nice from "arbitrary or mean-spirited" enforcement within the meaning of cases like *In re Victor L.* (2010) 182 Cal.App.4th 902, 913 (*Victor L.*).

We agree with the People that Nice reads the condition too broadly, but nevertheless find it requires modification. Nice seems to suggest that his general or even theoretical knowledge that a place harbors illegal drug use or sales, or used to harbor those activities, requires avoidance of the entire place. Such an expansive interpretation

22

could implicate nearly every corner of the urban map, from city parks to music concerts to public transit depots and certain city streets. But we find that scienter as stated in the condition requires more. For this reason, courts evaluating similar challenges in the context of other "stay away" orders, such as pertaining to areas of gang related activity, have often concluded that a knowledge requirement is sufficient to avoid a finding of vagueness or overbreadth.[7]

For example, in *In re H.C.* (2009) 175 Cal.App.4th 1067, the minor objected to a condition in relevant part requiring him to " 'not frequent any areas of gang related activity . . . .' " (*Id.* at p. 1072.) This court found the condition vague for two reasons. First, we concluded the word " 'frequent' " was challenging to understand because it suggested "the minor would not violate the condition with one or two visits" even though the record showed "the trial court intended the minor not to visit such areas at all." (*Ibid.*) Second, we reasoned "[a]n area with 'gang-related activity' might be, in some instances, an entire district or town. It would be altogether preferable to name the actual geographic area that would be prohibited to the minor and then to except from that certain kinds of travel, that is, to school or to work. At the very least, the condition . . . should be revised to say that the minor should not visit any area *known to him* to be a place of gang-related activity." (*Ibid.*, italics added.) We then remanded the case to the trial court to more closely tailor the condition consistent with *In re Sheena K.*, *supra*, 40 Cal.4th at page 890.

Although *In re H.C.* noted it would be preferable if the trial court listed specific geographic areas for the minor to avoid, the court ruled that a knowledge requirement would provide the minor sufficient notice about what specific locations are prohibited.

---

[7] The parties have not referenced any cases, and we have found none published, that address the arguments raised here in the context of what appears to be a commonly imposed probation condition that a probationer not go (or be) *anywhere the probationer knows illegal drugs are used or sold*.

(*In re H.C.*, *supra*, 175 Cal.App.4th at p. 1072.)  Consistent with this reasoning, in *People v. Leon* (2010) 181 Cal.App.4th 943, this court modified a condition that stated " 'You're not to frequent any areas of gang-related activity' " to include a scienter element and eliminate the vague term " 'frequent.' " (*Id*. at p. 952.)  We explained that without a knowledge requirement, the defendant could be punished for unwittingly entering an area of gang-related activity.  (*Ibid*.)  The modified condition in *People v. Leon* stated, " 'You are not to visit or remain in any specific location which you know to be or which the probation officer informs you is an area of criminal-street-gang-related activity.' " (*Ibid*.)

And in *People v. Barajas* (2011) 198 Cal.App.4th 748 (*Barajas*), this court determined no modification was necessary to a similar probation condition that already included an express knowledge requirement.  That condition stated:  " 'You're not to visit or remain in any specific location which you know to be or which the probation officer informs you to be an area of criminal street gang-related activity.' " (*Id*. at p. 754.)  We found the condition was not impermissibly vague because "[t]he knowledge condition suffices to give defendant fair warning of what areas to avoid and ensures that he will not be found in violation due to a factual mistake, accident, or misfortune."  (*Id*. at p. 760.)  The court thus rejected the defendant's argument that in order to remedy the condition's alleged vagueness and overbreadth, the trial court should have " 'delegated to the probation officer the responsibility of defining specific areas or places that appellant must not visit or remain in, under general guidelines approved by the court.' " (*Id*. at p. 757.)  The court also disagreed with the defendant that *Victor L.*, *supra*, 182 Cal.App.4th 902, decided a year earlier by the First District Court of Appeal, supported a different outcome.  The *Barajas* court explained:  "We see no essential difference between the modified condition in *Victor* and the challenged condition in this case.  Both require the probationer to avoid what he knows to be areas of criminal-street-gang-related activity, and both provide that the probationer may (not must) gain this knowledge from the probation officer." (*Barajas*, *supra*, at p. 759.)

24

The court in *Victor L.* considered challenges to several probation conditions, including in pertinent part a condition stating, " 'Minor shall not be in any . . . areas known by Minor for gang-related activity.' " (*Victor L.*, *supra*, 182 Cal.App.4th at p. 913, fn. 7.) Despite the knowledge requirement, the court was "troubled by the lack of specificity in the language of the condition." (*Id.* at p. 914.) The court determined that "even with a knowledge requirement, the gang-related activities condition is impermissibly vague in that it does not provide notice of what areas [Victor] may not frequent or what types of activities he must shun." (*Ibid.*, citing *In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.) But the court rejected as unreasonable the minor's suggestion that the phrase " 'gang-related activity' " could be so broadly construed as to significantly impair his freedom of movement, such that "shopping at the same grocery store or using the same post office that other gang members patronize" could constitute a violation. (*Victor L.*, *supra*, at p. 915.) Instead, the court focused on whether the condition was tailored to lawfully achieve its purpose: "While no doubt intended to serve the reformative and rehabilitative goals of probation, the condition as written, without further specificity, is not sufficiently clear to put Victor on notice of the prohibited conduct. The ambiguity of the chosen language conjures up divergent possible definitions of the term 'gang-related activity,' and reasonable minds may differ as to precisely which 'areas' would come within the condition's purview." (*Id.* at p. 916.)

*Victor L.* discussed alternative approaches to clarifying the condition, such as providing descriptive or mapped boundaries, restricting the ban to areas of activity of the particular gang involved, and "focus[ing] on the nature of the activity, rather than the geographic area in which it occurs, thereby forbidding Victor's presence in the immediate vicinity of activities or events likely to attract gang members." (*Victor L.*, *supra*, 182 Cal.App.4th at p. 917.) Rather than remand to the trial court to clarify, the court modified the probation condition to allow the probation officer to notify the minor of areas he must avoid or of activity-specific limits. (*Id.* at p. 918.) The court concluded

25

that "[s]uch specification . . . not only reinforces the knowledge requirement, but also makes the condition of probation both clear enough to avoid a vagueness challenge and narrow enough to escape a claim of overbreadth." (*Ibid.*, fn. omitted.)

Applying the reasoning of these cases here, the knowledge requirement constrains a reasonable interpretation of the condition to reach only *knowing* presence in the prohibited location. "A probation condition should be given 'the meaning that would appear to a reasonable, objective reader.' " (*People v. Olguin* (2008) 45 Cal.4th 375, 382.) Unlike in *In re H.C.* and *People v. Leon*, there is no danger that Nice might violate the probation condition unwittingly, because he must *know* that illegal drugs or non-prescribed controlled substances are being used or sold. The phrase "are used or sold" connotes a present or ongoing action and does not support an interpretation that knowledge of past use or past sales, without more, would trigger a violation. Inasmuch as Nice cannot violate the probation condition unless he "knows illegal drugs or nonprescribed controlled substances are used or sold" in that place, we find that like in *Barajas*, the knowledge condition ensures that Nice "will not be found in violation due to a factual mistake, accident, or misfortune." (*Barajas*, *supra*, 198 Cal.App.4th at p. 760.)

But like in *Victor L.*, we find the knowledge condition may not suffice to provide fair notice to Nice of "which 'areas' would come within the condition's purview." (*Victor L.*, *supra*, 182 Cal.App.4th at p. 916.) That is, the words "shall not go anywhere . . ." fail to assign any sense of scale or scope to the taint of illegal drug activity in a location, and "reasonable minds may differ" as to whether Nice can remain "anywhere" in a public space where he knows prohibited drug activity is taking place. (*Ibid.*) Consequently, we find the condition is overbroad because the failure to specify scale or scope inevitably will impinge on lawful travel and movement more than otherwise required in order to enforce the purpose of the probation condition.

Yet we do not find that assignment of a "stay away" distance would remedy the infirmity in these circumstances. Whereas several hundred yards may be required to put

26

appropriate distance between Nice and an illicit drug transaction taking place in a large open space, such as a public park or the beach, a lesser distance may be reasonable in other circumstances, such as on a light rail car where Nice's options may be limited to abandoning the train or moving to the other end.[8]  A distance of some yards therefore may offer precision on paper but would not ensure a reasonable restriction in the context of our dynamic public spaces.

Instead, we look to the language modified by the court in *Leon*, which stated, " 'You are not to *visit or remain* in any *specific location* which *you know to be* or which the probation officer informs you is an area of criminal-street-gang-related activity' " (*People v. Leon*, *supra*, 181 Cal.App.4th at p. 952, italics added) and in *Barajas*, which stated, " 'You're not to *visit or remain* in any *specific location* which *you know to be* or which the probation officer informs you to be an area of criminal street gang-related activity.' " (*Barajas*, *supra*, 198 Cal.App.4th at p. 754, italics added.)  The use of the same or similar terms would narrow the scope of the condition here so that Nice could not be found in violation for being "*anywhere*" he knows illegal drugs are being sold or used, but more narrowly for *visiting or remaining in a specific location* where he knows illegal drugs are being used or sold.  Just as the knowledge requirement eliminates unwitting or accidental violation of the probation condition, we find the additional specification that Nice *not visit or remain* in a *specific* location makes the probation condition clear enough to avoid a claim of vagueness.  (*Victor L.*, *supra*, 182 Cal.App.4th at p. 918.)  The modified condition also reduces the likelihood of a possible violation based on lawful conduct comprising travel to and through public spaces enough to escape a claim of overbreadth.  (See *Perez*, *supra*, 176 Cal.App.4th at p. 384.)

---

[8] These are purely illustrative examples and are not intended to offer guidance on an appropriate distance between a probationer and an illicit drug activity or transaction known to the probationer.

Accordingly, we will modify the second part of the probation condition to incorporate the terms approved in *Leon* and *Barajas* pertaining to visiting or remaining in a specific location where the probationer knows the prohibited activity is underway.

### III.  DISPOSITION

As to defendant Delconte, the judgment is affirmed.

As to defendant Nice, the probation condition is modified in part to state:  "You shall not possess or use any illegal drugs or illegal controlled substances or visit or remain in any specific location where you know illegal drugs or non-prescribed controlled substances are used or sold."

As modified, the judgment as to defendant Nice is affirmed.

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Márquez, J.

People v. Nice et al.
H041847

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. C1233969 |
| Trial Judge: | Hon. Ron Del Pozzo |
| Counsel for Plaintiff/Respondent:<br>The People | Kamala D. Harris<br>Attorney General<br><br>Gerald A. Engler<br>Chief Assistant Attorney General<br><br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br><br>Catherine A. Rivlin<br>Supervising Deputy Attorney General<br><br>Allen R. Crown<br>Deputy Attorney General |
| Counsel for Defendant/Appellant:<br>Steven Andrew Nice | Under appointment by the Court of Appeal<br>Jennifer Bruno |
| Counsel for Defendant/Appellant:<br>Carlo Antonio Delconte | Law Office of Paul Kleven<br>Paul Kleven |

People v. Nice et al.
H041847